Pee Curiam:
These cases were referred to Trial Commissioner Harry E. Wood with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on October 29, 1970. Exceptions to the commissioner’s opinion, findings of fact and recommended conclusion of law were filed by plaintiffs, defendant moved that the court adopt the commissioner’s report and the case has been submitted to the court on oral argument of counsel and the briefs of the parties.
Since the court agrees with the commissioner’s opinion, findings of fact and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in these cases. Therefore, plaintiffs are not entitled to recover and their petitions are dismissed.
OPINION OE COMMISSIONER
Wood, Commissioner: Plaintiffs in these cases[1]. *were, throughout all or part of the period here material,[2] ungraded vessel employees of the Bureau of Commercial Fisheries, Department of the Interior, employed as engineers aboard the
*775 Delaware or Albatross IV,[3] with, home ports of Gloucester and Woods Hole, Massachusetts, respectively.
Both vessels were employed in aid of the commercial fishing industry, primarily in New England waters, during the relevant period. The Delaware, a converted fishing vessel built in 1938, was an exploratory fishing and gear research vessel employed, i/nter alia, in testing experimental fishing gear and in fishing for research purposes; fishing was the main activity aboard the vessel during a cruise. The Albatross IV, built in 1962, was specially designed to, and did, conduct fisheries and oceanographic research. See findings 7,8.
Section 202(8) of the Classification Act of 1949, 63 Stat. 954, 955, as amended, 5 TJ.S.C. § 1082(8) (1964),[4] provided in pertinent part that:
This Act [Classification Act of 1949] * * * shall not apply to —
* * * * *
(8) officers and members of crews of vessels, whose compensation shall be fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates and practices in the maritime industry.
That plaintiffs were within the purview of Section 202(8) is admitted; at issue is defendant’s treatment of them under the statute.
I
Throughout the period here relevant, authority to approve wage rates for plaintiffs was vested in the Regional Director, Region 3, Bureau of Commercial Fisheries; the determination of such wage rates in the first instance (subject to ap^ *776 proval) was made by the “Kegion 3 Wage Board”, composed of a chairman, two members, and two alternate members.
In findings 16-23, Wage Board practices and procedures in setting wage rates for plaintiffs prior to and throughout the period here material are detailed at some length. With some variants in formula from year to year, plaintiffs’ compensation for hours worked at sea was essentially derived from the average hourly earnings of commercial fishermen in the large (lY-man) otter trawler fleet operating out of Boston, Massachusetts, applied to the number of days estimated to be worked at sea by plaintiffs, utilizing a 12-hour workday for each such day. Other factors, noted in the findings, were utilized to adjust the “basic fisherman’s sea pay” in order to arrive at annual compensation for plaintiffs’ work a/t sea.[5]
At least during the 1960-1965 period, there was no such thing as overtime in the commercial fishing industry. Engineers employed aboard a large Boston otter trawler were compensated on the basis of a “share” of a percentage of the proceeds of the catch[6] plus a “bonus” for each fishing trip, and were paid no “overtime” compensation for any hours worked at sea. Finding 25 (e).
Since, insofar as hours at sea are concerned, wage rate schedules for plaintiffs were derived from earnings of Boston otter trawler crew members, these wage rate schedules .in turn reflected no element of overtime compensation for work at sea in excess of 8 hours per weekday or 40 hours a week, nor for hours worked on Saturdays, Sundays, or holidays. Plaintiffs’ “normal” work day at sea was not less than 8 nor more than 12 hours, and they in fact worked at sea up to 12 hours per day prior to December 17,1965.
Generally speaking, during part or all of the period here material, engineers serving at sea aboard commercial dry cargo and tanker vessels, at least some oceanographic research vessels operated by private industry, and vessels op- *777 crated by the Military Sea Transportation Service (MSTS), Department of the Navy, were paid premium or overtime compensation for work in excess of 8 hours per weekday or 40 hours per week, or for work on Saturdays, Sundays, or holidays.
In the circumstances noted hereinabove, plaintiffs were not. The essence of their complaint is that in utilizing the commercial fishing industry, and in failing to select “the commercial off-shore, dry cargo and tanker industry,”[7] as “the maritime industry” for Section 202(8) purposes, defendant acted unlawfully, arbitrarily, capriciously, and unreasonably. Accordingly, they assert, they are entitled to recover overtime compensation for all hours of work performed at sea in excess of 8 hours per weekday or 40 hours per week, and for all hours worked on Saturdays, Sundays, or holidays.
For reasons hereinafter set forth, it is concluded that plaintiffs are not entitled to recover.
II
One of plaintiffs’ contentions is that defendant “violated [Section] 202(8) * * * in setting the marine engineer plaintiffs’ wages in accordance with a hybrid standard pay formula based on the earnings on the 17-man fishing trawler industry sailing out of Boston, Massachusetts harbor.”[8] Plaintiffs assert that, under Ayres v. United States, 186 Ct. Cl. 350 (1968), a “showing of prevailing maritime industry practices in situations comparable to their own” will entitle them to prevail. And, they urge, a comparison of the elements of plaintiffs’ employment with (a) the commercial fishing industry, and (b) the “commercial dry cargo and tanker industry as well as the private oceanographic research industry and with other ¡[vessel-operating government] agencies”, proves clearly a violation of Section 202(8).
In Daniels v. United States, 187 Ct. Cl. 38, 407 F.2d 1345 (1969), involving a similar claim, the court reaffirmed that Section 202(8) embodies a broad congressional grant of administrative discretion, with a concomitant limited scope *778 of judicial review. “Our concern”, tiie court held, “is simply to determine whether plaintiffs have met their heavy burden of proving that the Secretary’s action in this instance was so arbitrary as to be clearly wrong.” Ibid, 187 Ct. Cl. at 42, 407 F.2d at 1347. It is unnecessary to consider whether or not, in light of Daniels, plaintiffs read Ayres rightly. That they have failed to make the evidentiary showing they avow is dispositive.
Plaintiffs allege great differences between engineers aboard the Albatross IV and the Delaware and engineers aboard a Boston otter trawler; conversely, they would substantially equate engineers aboard the vessels in suit with those in the commercial dry cargo and tanker industry (and, to a lesser degree, the private oceanographic research industry and other vessel-operating government agencies). The “numerous comparisons” proffered include duties, equipment responsibilities, nature of missions, education and training experience, “wages, hours and compensation” and “prevailing rates and practices regarding payment of overtime or premium pay”.[9]
To the extent permitted by the record, each of these factors is treated in the findings; what there appears will not be repeated here. For present purposes, it suffices to hold there is an absence of proof that in terms of duties, responsibilities, working conditions, character of work, or otherwise, plaintiffs were in any significant manner “comparable” to engineers aboard commercial dry cargo or tanker vessels, oceanographic research vessels operated by private industry, or vessels operated by other government agencies. Ayres v. United States, supra.
Research vessels operated in aid of the commercial fishing industry are obviously not commercial fishing vessels.[10] Manifestly, there were some differences, in terms of duties, responsibilities, working conditions, character of work, and the like, between engineers aboard the Albatross IV at sea and engineers aboard large Boston otter trawlers.[11] On this *779 record, however, it cannot be concluded that in determining that plaintiffs’ wages should be fixed in accordance with prevailing rates and practices in the commercial fishing industry, the Secretary violated Section 202(8). Daniels v. United States, supra; Ayres v. United States, supra; Abbott v. United States, 138 Ct. Cl. 459, 463, 151 F. Supp. 929, 932 (1957).
In so holding, due consideration has been given to two subsidiary contentions: an asserted admission by defendant that the practices employed throughout the period here material were unlawful,[12] and that “the maritime industry”, for Section 202(8) purposes, is the “commercial off-shore, dry cargo and tanker industry * *
Following December 17, 1965, plaintiffs have been compensated on the basis of wage rates negotiated with their “exclusive representative” under Executive Order No. 10988, Employee-Management Cooperation in the Federal Service, January 17,1962, 27 Fed. Eeg. 551.[13] In the first such agreement, in 1965, the practice of no overtime for work at sea, regardless of hours actually worked, was in essence continued. Finding 24(c). There was no waiver of any' legal rights or actions, all such rights and actions being specifically reserved.
Plaintiffs’ admission argument flows, not from the 1965 agreement, but from one by which plaintiffs assert defendant “agreed [in 1968] that the prevailing rates and practices of the maritime industry did not include the fishing industry * * *, but were to be based on the prevailing rates and practices in the commercial dry cargo and tanker industry * * [14] The absence of proof that there was an adoption of prevailing rates and practices of the dry cargo and tanker industry aside, the 1968 agreement would no more amount to an “admission” by defendant of the illegality of pre-1965 practices than the 1965 one would amount to recognition *780 by plaintiffs of their legality. Plaintiffs’ reliance on a post-1965 admission is misplaced.
Plaintiffs’ contention respecting the meaning of “the maritime industry” has as its foundation language in House Report No. 2200, 89th Congress, 2d Session,[15] to accompany the bill which ultimately became Public Law No. 89-747, 80 Stat. 1179,5 U.S.C. § 6305 (Supp. V, 1965-69).
Public Law No. 89-747 accords government officers or crew members aboard any “oceangoing vessel on an extended voyage”, including plaintiffs, leave of absence without regard to other leave authorized by “this subchapter.” Findings 37 (a), (b). That an allusion, in House Report No. 2200, to “the maritime industry” means the “commercial off-shore, dry cargo and tanker industry”, as plaintiffs assert, is far from clear. In any event, however, plaintiffs’ assumption that “the maritime industry”, for Section 202(8) purposes, could have only that same meaning is not a tenable one.
Section 202(8) and Public Law No. 89-747 were enacted at different times, and deal with different matters: the one compensation for officers and members of crews of vessels, to be fixed “as nearly as is consistent with the public interest in accordance with prevailing rates and practices in the maritime industry,” and the other leave benefits for officers and crew members aboard oceangoing vessels on an extended voyage. Nothing in the cited legislative history of Public Law No. 89-747 justifies adding to Section 202(8) words not included therein by Congress when it wrote the law in 1949, or thereafter. United States v. Bacto-Unidisk, 394 U.S. 784, 800-01 (1969); 68 Cases of Jam v. United States, 340 U.S. 593, 600-01 (1951). And, plaintiffs proffer no legislative history of Section 202(8) itself to buttress their views.
It is to be remembered, in assaying this aspect of the matter, that the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one. Waterman Steamship Corp. v. United States, 381 U.S. 252, 269 (1965); United States v. Wise, 370 U.S. 405 (1962); compare Red Lion Broadcasting Co. v. Federal Communications Commission, 395 U.S. 367, 380-81 (1969). Nothing in the record or plaintiffs’ briefs supports the view that, in utilizing the com *781 mercial fishing industry for Section 202(8) purposes, defendant thereby exceeded the scope of the statute.
Ill
Plaintiffs also contend vigorously that “the Wage Board set their wages in an arbitrary, capricious and unreasonable manner in violation of [Section] 202(8) * * [16] This contention has two main facets: the essence of the first is that because of inadequate knowledge and experience, the chairman of the Wage Board throughout the period here material was unable to, and did not, “compare” plaintiffs with reasonably comparable services in the maritime field; of the second, that the Wage Board itself “made no attempt to compare.”[17]
It is perhaps a complete answer that the record does not justify plaintiffs’ view of comparable services. Section II, supra. There is a failure of proof that any reasonably comparable services in the maritime industry were not considered by the Wage Board. Thus, the argument that plaintiffs’ pay was fixed and adjusted without examination of the “functions, duties, and pay structures of all pertinent classes * * * in Government service and outside it”[18] would seem to be blunted. There are, however, other flaws in plaintiffs’ position in any event.
Because Section 202(8) contains a broad congressional grant of administrative discretion, it imposes heavy administrative duties and responsibilities. In committing to the Secretary the task of wage-fixing for vessel employees, Congress conferred upon him “the duty of setting a fair and competitive wage.” See Abbott v. United States, supra, 138 Ct. Cl. at 463, 151 F. Supp. at 932. Discharge of that duty, by a determination of compensation “as nearly as is consistent with the public interest in accordance with prevailing rates and practices in the maritime industry,” presupposes appropriate knowledge and consideration. See Daniels v. United States, supra, 187 Ct. Cl. at 42-44, 407 F.2d at 1347-49; Abbott v. United States, supra.
*782 Within what is now the Bureau of Commercial Fisheries, there is a history of the utilization of wage rate data from the commercial fishing industry for Section 202(8) purposes nearly as old as Section 202(8) itself. Within Eegion 3, the practice was in existence prior to 1958. In 1958, with the advent of a new Wage Board chairman, a thorough reevaluation of prior Wage Board practices toward vessel employees was undertaken. Consideration was given to setting wage rates for vessel employees aboard the Delaware based on earnings of oceanographic research vessel employees of the Woods Hole Oceanographic Institution, but it was subsequently concluded that the prior procedure should continue to be followed.[19]
In 1959, the Eegional Director, Eegion 3, appointed to the Wage Board a new chairman. The two members and the two alternate members who had been a part of the prior Wage Board continued to serve on the Wage Board. One of the two members, and one of the two alternate members, remained on the Wage Board throughout the period here material, as did the chairman appointed in 1959.
The approval of the Eegional Director, Eegion 3, of any wage rate schedule determinations of the Wage Board was a prerequisite to effectuation of wage rate schedules affecting plaintiffs throughout the period here material. Plaintiffs have neither offered evidence nor requested any findings of fact concerning the Eegional Director’s knowledge, experience, bases for decision, or actions. The evidence relevant to the actions and knowledge of the Wage Board and the Wage Board chairman appointed in 1959 is summarized in findings 16-23.
At the outset of his tenure in 1959, the chairman of the Wage Board was clearly not as knowledgeable as he might have been; even to time of trial in 1968, he had never been aboard either the Delaware or the Albatross IV during a scientific operation, nor had he even been aboard a commercial fishing vessel. He relied, at least to some extent, on ver *783 bal advice from other Wage Board members, first in looking to the commercial fishing industry for wage rate schedule purposes, and later in an understanding of plaintiffs’ duties and responsibilities as compared to those of persomiel aboard commercial fishing vessels.
The record also shows, however, that all Wage Board members were of the opinion that plaintiffs were engaged in “fishing operations”; that the Wage Board considered all the duties and responsibilities of vessel employees aboard the Albatross IV and the Delaware and compared them with duties and responsibilities of employees in the commercial fishing industry; that, in 1959 and thereafter throughout the period here material, the Wage Board included at least one member and one alternate member who had participated in the 1958 reevaluation of Wage Board practices; that the Wage Board considered the commercial fishing industry part of the maritime industry; and that the Wage Board’s determinations were unanimous.
There was, in substance, a considered determination that plaintiffs’ duties and responsibilities most closely approximated those of personnel in the commercial fishing industry. And, it is not established that in reaching that determination, any reasonably comparable services in the maritime industry were ignored.
Whether, and under what circumstances, a lack of knowledge on the part of a Section 202(8) wage-fixing body, or any of its members, vitiate its actions need not be reached. On this record, it cannot be concluded that the Wage Board or the Regional Director, Region 3, acted arbitrarily or capriciously in utilizing a formula based on average hourly earnings of commercial fishermen in the large otter trawler fleet operating out of Boston in setting plaintiffs’ wage rates for work at sea. Daniels v. United States, supra; Abbott v. United States, supra; cf. Amell v. United States, 182 Ct. Cl. 604, 614, 390 F.2d 880, 885 (1968), cert. denied, 393 U.S. 852 (1968).
IV
Finally, plaintiffs contend that defendant has departed from a congressional mandate and requirement in the pub- *784 lie interest that plaintiffs be paid overtime for all work in excess of 8 hours per day or 40 hours per week, and for all work performed on Saturdays, Sundays, or holidays. The theory seems to be that Section 23, Act of March 28,1934,48 Stat. 522, as amended, 5 U.S.C. § 673c (1964)[20] is “specifically made applicable” [21] to plaintiffs by Sections 102(c) and 203 of the Federal Employees’ Pay Act of 1945, 59 Stat. 295, as amended, 5 U.S.C. §§ 902(c), 913 (1964) .[22]
Briefly, Section 102(c), as amended, provided that the Federal Employees’ Pay Act of 1945, “except sections 203 and 607” (the latter section here irrelevant) should not apply to employees whose basic compensation was fixed and adjusted from time to time in accordance with prevailing rates by wage boards or similar administrative authority serving the same purpose. Section 203, as amended, provided that such employees should be entitled to overtime “in accordance with the provisions of section 23 of the Act of March 28, 1934 * *
In ithe Federal Employees’ Pay Act of 1945, Congress drew a distinction between those employees covered by Section 102(c) and “vessel employees of the Department of Interior”. Section 102(d), Federal Employees’ Pay Act of 1945, 59 Stat. 295,296, as amended, 5 U.S.C. § 902(d) (1964). The 1945 Act, “except sections 606 and 607”, does not apply to such vessel employees (emphasis supplied). Section 606, 5 U.S.C. § 946 (1964), provided that such employees “may be compensated in accordance with the wage practices of the maritime industry.”
As the recent revision and codification of Title 5 and other acts of Congress in this area make clear, the distinction has been perpetuated. E.g., 5 U.S.C. §§ 5102(c) (7), (8), 5541(2) (xi), (xii) (Supp. V, 1965-69). Upon a careful review of the statutory scheme, it is concluded that plaintiffs, vessel employees of the Department of the Interior, can claim no benefits under Sections 102(c) and 203 of the 1945 Act. Compare *785 Panama Canal Co. v. Anderson, 312 F.2d 98 (5th Cir.1963), cert. denied, 375 U.S. 832 (1963).
V
Defendant’s arguments that plaintiffs are estopped from assenting the claims sued upon by “their acquiescence and active participation in setting the very wage rates which they now attack”,[23] and that the claims are barred by laches, need not be reached. Cf. Albright v. United States, 161 Ct. Cl. 356, 362-63 (1963); Abbott v. United States, supra; Parmenter v. United States, 125 Ct. Cl. 35 (1953).
Findings oe Fact
1. Plaintiffs in these cases[1] were, throughout all or part of the period here material, ungraded vessel employees of the Bureau of Commercial Fisheries, United States Fish and Wildlife Service, Department of the Interior, employed as follows :■

*786 2. (a) The petition in No. 170-66 was filed May 26,1966.
(ib) The petition in No. 298-66 was filed August 12,1966.
(c) The petition in No. 28-67 was filed January 27,1967.
3. Plaintiffs seek to recover overtime or premium compensation for all work at sea on Department of the Interior vessels in excess of 8 hours per day or 40 hours per week, and on Saturdays, Sundays, and holidays.[2] There is no claim by plaintiffs concerning any work in port.
4. With the approval of the late Commissioner Bichard Arens, who presided at trial and closed proof, (a) trial of the cases was limited to the issues of law and fact relating to plaintiffs’ right to recover, reserving the determination of the amount of recovery, if any, for further proceedings; and (b) plaintiffs and defendant agreed that “the determination of this Court on the liability of the United States in the aforesaid cases with respect to plaintiffs whose claims are based on employment on the B/V Albatross IV, and/or the B/V Delaware shall be applicable to and binding on plaintiffs in the aforesaid cases whose claims are based on employment in whole or in part on the B/V Oregon, B/V George M. Bowers, B/V Unda/mted and B/V Silver Bay”. Pursuant to this agreement, these three cases presently involve only engineers employed on the vessels Albatross IV and Delaware.
5. (a) Section 606 of the Federal Employees’ Pay Act of 1945, 59 Stat. 295, 804, as amended by the Act of May 24, 1946, 60 Stat. 216, 218, 5 U.S.C. §946 (1964), provided in part that “vessel employees of the Department of the Interior * * * may be compensated in accordance with the wage practices of the maritime industry.”
(b) Section 202(8), Act of October 28,1949, 68 Stat. 954, 95'5, as amended, 5 U.S.C. §1082(8) (1964), as in force throughout the period commencing prior to 1960 and extending to September 5, 1966, provided in pertinent part that:
This Act [Classification Act of 1949] * * * shall not apply to—
$ * * * *
*787 (8) officers and members of crews of vessels, whose compensation shall be fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates and practices in the maritime industry.
(c) Effective September 6, 1966, the foregoing statutes were revised, codified, and enacted into law as follows:
(1) Section 5102(c), Title 5, United States Code (Supp. Y, 1965-69), provides in part that:
This chapter [Chapter 51, Classification] does not apply to—
*****
(8) officers and members of crews of vessels; *****
(2) Section 5342(a), Title 5, United States Code (Supp. Y, 1965-69), provides in part that:
* * * the pay of officers and members of crews of vessels excepted from chapter 51 of this title by section 5102(c) (8) of this title shall be fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates and practices in the maritime industry.
6. (a) By the Act of August 8,1956,70 Stat. 1120,16 U.S.C. § 742a et seq. (1964), which included among its purposes satisfying the needs of “the fishing industry, in its several branches,” Congress created within the Department of the Interior a United States Fish and Wildlife Service, which “shall succeed to and replace the presently existing Fish and Wildlife Service of the Department,” and consisting of two separate agencies, the Bureau of Commercial Fisheries and the Bureau of Sport Fisheries and Wildlife.
(b) The Bureau of Commercial Fisheries is by statute responsible for specified matters relating primarily to commercial fisheries, whales, seals, and sea lions. During the period here material,[3] the Bureau provided activities relating to marine fisheries (including the conduct of biological research on commercially important species of fish, shellfish and mammals off all coasts of the United States, in the high *788 seas, and in waters adjacent to territories and possessions); inland fisheries; services to commercial fisheries (including the exploration of fishing operations to determine the character, extent and availability of resources, and to test, devise and demonstrate most effective gear and vessel types); international agreements and fur sealing; enforcement; and field supervision.
7. (a) The Delaware is a converted fishing vessel built in 1938 and, from 1938 to about 1942, employed, under private ownership, as a commercial fishing vessel. After World War II service as a minesweeper and general cargo vessel, the Delaware was again employed in fishing operations from 1946 to about 1950. In 1950, the Delaware was acquired by what is now the Bureau of Commercial Fisheries. Its stated “cost” is $302,473. In outward physical appearance, it is a typical fishing vessel.
(b) Characteristics of the Delaware include:
Length Overall: 147 feet, 6 inches.
Beam: 25 feet.
Gross Tonnage: 303.85.
Net Tonnage: 172.00.
Horsepower: 735 at 360 r.p.m.
Crew Accommodations: 23.
Speed: 10 knots.
(c) The original hold capacity of the Delaware was 8,000 cubic feet, 260,000 pounds of iced fish. Some time after 1950 this capacity was reduced to 4,400 cubic feet, 145,000 pounds of frozen or iced fish. The record is silent as to exact hold capacity during the period here material, but does reflect that, in 1968, the vessel did not have the same facility for carrying fish as a commercial fishing vessel; it then did have a 20-ton freezer on board for specimens.
(d) Throughout the period here material, the Delaware had a complement of 12 to 15: a master or captain; a first officer or mate; and (at different times) two, three, or four engineers, all licensed personnel; and unlicensed personnel including a cook, a mess attendant, and others styled “seamen” or “fishermen.” At times, the vessel also had a second officer or mate.
*789 (e) At least insofar as master, mates, and most unlicensed crew members of the Delaware were concerned, prior commercial fishing experience was not only essential to successful vessel operation but a prerequisite to employment.[4] Fishing was the main activity aboard the Delaware during a cruise. The vessel was not engaged in commercial fishing in the normal sense, of course, but in exploratory fishing and gear research; biological studies on groundfish and other marine life were also performed. Scientific personnel were normally carried on a cruise. Throughout the period here material, the Delaware was primarily an oceangoing exploratory fishing and gear research vessel employed in aid of the commercial fishing industry. In the accomplishment of its mission the vessel was employed in testing experimental fishing gear and in fishing for research purposes, primarily in New England waters.
(f) Neither the mission of, nor the duties of engineers serving aboard, the Delaware changed between 1960 and 1968.
8. (a) The Albatross IV was launched in April 1962, completed in October 1962, and commissioned May 9, 1963. It was specially designed to conduct fisheries and oceanographic research in the northwest Atlantic, and, specifically, to meet operational requirements developed by the Bureau of Commercial Fisheries Biological Laboratory, Woods Hole, Massachusetts.[5] Its stated “cost” is $2,000,000.
(b) Characteristics of the Albatross IV include:
Length Overall: 187 feet.
Beam (moulded): 33 feet.
Displacement Tonnage: 1,000.
Gross Tonnage: 930.
Horsepower, Main Engines: 1,000-1,100.
Accommodations:
Officers: 6.
Crew: 16.
Scientists: 16.
Speed, designed: 12 knots.
*790 (c) Throughout the period here material, the Albatross TV had a complement of 19: a master or captain; a first officer or mate; a second officer or mate; and three engineers, all licensed personnel; and unlicensed personnel including a steward, a cook, two mess attendants, a wiper-oiler, and eight fishermen.
(d) While on most cruises of the Albatross TV there was some fishing, the vessel did not engage in commercial fishing in the normal sense, but in fishery and ¡biological research studies and oceanographic research. Scientific personnel were normally carried on a cruise. Throughout the period here material, the Albatross IV was primarily a fisheries and oceanographic research vessel employed in aid of the commercial fishing industry. In the accomplishment of its mission, the Albatross IV was employed for purposes of, inter alia, groundfish surveys, oceanographic surveys of ecosystem dynamics, flounder tagging, sea scallop surveys, environmental surveys, benthic surveys, experimental studies, and studies of haddock biology, survey techniques, and sea herring, primarily in New England waters.
(e) Neither the mission of, nor the duties of engineers serving aboard, the Albatross TV changed between 1963 and 1968.
9. As to the Delaware:
(a) Qualification standards for the position of chief engineer (or chief engineer-fisherman, as the position was sometimes called) included possession of a valid license as chief engineer for diesel-propelled vessels of at least the Delaware’s horsepower rating and at least 3 years’ experience as chief engineer on vessels of like size; an applicant without an appropriate license might, however, qualify with 5 years’ recent experience as an engineer on diesel vessels, 2 years of which “must have been on a Service or fishing vessel”, plus demonstrated ability to operate the machinery of the Delaware. Experience on commercial fishing trawlers was “desirable.”
(b) Qualification standards for the position of first assistant engineer (or assistant engineer-fisherman) included possession of a valid license as first assistant engineer for *791 diesel-propelled vessels of at least the Delaware’s horsepower rating and at least 3 years’ service as first assistant “or better on vessels of such size * * an applicant without an appropriate license might, however, qualify with 4 years’ experience as an engineer on diesel vessels, 1 year of which “must have been on a Service vessel”,[6] plus demonstrated ability to operate the machinery of the Delaware.
(c) Qualification standards for the position of second assistant engineer (or second assistant engineer-fisherman) included possession of a valid license as second assistant engineer for diesel-propelled vessels of at least the horsepower rating of the Delaware, and at least 3 years’ service as second assistant engineer “or better on vessels of such size * * an applicant without an appropriate license might, however, qualify with 4 years’ experience as an engineer on diesel vessels, 1 year of which “must have been on a Service or fishing vessel”, plus demonstrated ability to operate the machinery of the Delaware.
(d) First consideration for all three engineer positions aboard the Delaware “will be given to applicants possessing an appropriate license.”
10. As to the Delaware:
(a) The duties of the position of chief engineer included responsibility for the safety, maintenance, proper operation and keeping of records pertaining to the ship’s engines, auxiliaries, electrical and refrigeration equipment, piping, steering gear, deck machinery, pumps and miscellaneous allied equipment; at sea, standing regular watch, being subject to call for repair work, and assisting in fishing operations when required; and, in port, being in charge of and assisting in the performance of all maintenance and repair work under his jurisdiction. At the completion of each voyage, the chief engineer also prepared reports pertaining to repair work, *792 operating supplies, and equipment needed for the next voyage. He also kept an engineer’s log on protective and preventive maintenance, engine fuel consumption, and refrigeration machinery, and other operational records as required.
(b) The duties of the position of first assistant engineer included responsibility to the chief engineer for the safety, proper operation, maintenance and repair of all equipment under the jurisdiction of the chief engineer; serving in the place of the chief engineer in emergencies at sea due to incapacity of the chief engineer or, at sea or in port, during any absence of the chief engineer; standing regular watch, being subject to call for repair work, and assisting in fishing operations when required and in the maintenance and repair of equipment, engines, and other vessel machinery and fishing gear in port; and performing a security watch and other duties as assigned in port.
(c) The duties of the position of second assistant engineer were essentially the same as those of the first assistant engineer. Where both the chief engineer and first assistant engineer were absent or incapacitated, the second assistant engineer was to assume the responsibility of the chief engineer.[7]
11. As to the Albatross IV:
(a) Qualification standards for the position of chief engineer included possession of a valid license as chief engineer, motor vessels, of at least 1,000 horsepower rating, and 1 year of successful experience as chief engineer or first assistant engineer on a motor vessel having at least 1,000 horsepower rating.
(b) Qualification standards for the position of first assistant engineer included possession of a valid license as first assistant engineer, motor vessels, of at least 1,000 horsepower rating, and 1 year of successful experience as first assistant engineer or second assistant engineer on a motor vessel having at least 1,000 horsepower rating.
(c) Qualification standards for the position of second assistant engineer included possession of a valid license as *793 second assistant engineer, motor vessels, of at least 1,000 horsepower rating, and 1 year of successful experience as second assistant engineer or third assistant engineer on a motor vessel having at least 1,000 horsepower rating.
(d) While experience on fishing vessels was not explicitly required for any of these positions, applicants for any of the positions with, inter alia, experience, familiarity, and knowledge of special equipment found aboard fishery research vessels “will be awarded” credit for “any appropriate special skills * *
12. As to the Albatross IV:
(a) The duties of the position of chief engineer included responsibility for the operation and maintenance of the main engine, auxiliaries, generators, air conditioning and heating plants, and for the maintenance of all of the machinery and equipment aboard normally under the care of the engineering department; responsibility for the machine shop; responsibility, in port, for the performance of all maintenance and repair work under his jurisdiction; and the preparation of reports, engineering department logs, engineer’s preventive maintenance schedules, engine fuel consumption records, and other engineering operational records as required.
(b) The duties of the position of first assistant engineer included being directly in charge of the engineroom and second-in-charge of the engineering department. During the absence or incapacity of the chief engineer, whether at sea or in port, he also served in place of the chief engineer.
(c) The duties of the position of second assistant engineer included standing regular engineroom watches and assisting in the operation and maintenance of equipment under the jurisdiction of the engineering department, as required.[8]
13. (a) The basic mission of a commercial fishing vessel was to catch fish for sale for profit.
(b) The basic missions of the Albatross IV and Delawoare were to perform fisheries and oceanographic research and exploratory fishing and gear research, respectively, both in aid of the commercial fishing industry.
*794 (c) The record indicates in general terms that the basic mission of an oceanographic research vessel (“AGOE”) operated by private industry was unique and scientific, and that the mission was to perform geophysical oceanographic research. The relationship, if any, in terms of basic mission, between such vessels and the vessels in suit does not appear.
(d) The record does not warrant findings with respect to basic mission (or missions) of a commercial dry cargo or tanker vessel, or of vessels operated by other government agencies.
14. (>a) Throughout the period here material, both the Delaware and the Albatross IV normally carried three engineers: a chief engineer, a first assistant engineer, and a second assistant engineer.
(b) Throughout the same period an oceangoing Atlantic tanker normally carried a minimum of five engineers; some dry cargo vessels carried six or eight engineers.
(c) Oceanographic research (AGOE) vessels operated by private industry normally carried four engineers.
(d) A large (17-man) otter trawler (commercial fishing vessel) operating out of Boston, Massachusetts, normally carried two engineers.
(e) Aboard the Albatross IV, one wiper-oiler assisted engineers in keeping the engineroom clean, making repairs, and oiling. The record is inconclusive as to whether the Delaware had such an employee. An AGOE vessel operated by private industry carried three oilers. A dry cargo vessel, of 7,000 to 10,000 tons, had perhaps three oilers, two or three wipers, an electrician, and three firemen in the engineering department; the normal complement of this department varied, depending on the size of the dry cargo vessel. The normal complement of the engineering department aboard oceangoing tankers is not established by the record.
15, (a) Prior to and throughout the period here material, authority within Eegion 3, Bureau of Commercial Fisheries, to determine, in the first instance, “prevailing rates of pay” within the meaning of Section 202 (8) (finding 5(b), swpra) for officers and members of the crew of the Delawa/re (and, subsequently, the Albatross IV) was vested in the so-called “Eegion 3 Wage Board”, consisting of a chairman, two mem *795 bers, and two alternate members. Authority to approve “rates of pay such as are determined to be prevailing in an area * * *” by the Region 3 Wage Board was vested in the Regional Director, Region 3.
(b) Excerpts from a memorandum of March 28, 1951, from the Acting Director, (then) Fish and Wildlife Service, to the Director of Personnel, Department of the Interior,[9] are set forth below :
* * * to carry out its functions involving a variety of scientific investigations * * *, this Service operates a fleet of seagoing vessels. * * * Since our operations are peculiar to the Service and are not generally comparable to those of the maritime industry or other government agencies, we feel that we should establish our rates and prescribe working conditions consistent with the type of operation and m the best interest of the government. * * * a Specialist * * * [who recently conducted] a study of our vessel operations including pay administration and conditions of employment * * * recommended * * * that officers and crew members be subject to call twenty-four hours a day * * * at sea and that rates of pay be set to compensate for this employment requirement.
* * * * *
* * * The operations of our vessels are directly concerned with scientific investigations * * *. The vessels are engaged in * * * (1) collection of biological, hy-drographic, and oceanographic data for research purpose [sic] * * *; (2) exploratory fishing * * *.
Due to * * * regularly scheduled cruises in the case of vessels engaged in scientific investigations, our operations consist of considerable home port duty * * * [ranging] from one-fourth to one-half time in research activities. The duties in home port involve the repair and maintenance of vessels and gear and preparations for sea voyages. ‘Around the clock’ operations are required seven days a week while the vessels are at sea. * * *
Since our vessel operations are concerned with natural resources programs they must be geared to accommodate natural conditions which are not amenable to control such as runs of fish which are influenced by biolog *796 ical, meteorological and oceanographic conditions. In addition many operations must be patterned after the habits of the commercial fishing industry.
In determining rates for vessels personnel we attempt to secure basic wage data from phases of the maritime industry which have some relation to our operations; e.g., fishing boats wherein crew members share in the total receipts of the catch. Other sources have been transport type operations and educational institutions which operate research vessels * * *.
To adapt the source data to our type of operations and to include ‘on-call’ duty twenty-four hours a day when at sea, it is necessary that adjustments be made to arrive at an equitable rate. * * *
We believe establishment of a ‘subject to call’ twenty-four hours a day sea duty policy is a practical approach which will facilitate both operations and administration of our vessels program. We believe it to be within the meaning of Section 202 (8) of the Classification Act of 1949 which provides that the compensation of officers and members of crews of vessels be fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates and practices in the maritime industry. It is proposed that this general policy be followed in establishing and revising schedules. Your concurrence is requested.
The approval sought was given April 13, 1951.
16. (a) Prior to 1958, the Region 3 Wage Board determined (and the Regional Director approved) wage rates for officers and members of the crew of the Delaware on a com. posite basis: an annual rate based on a comparison, for time spent at sea, “with the commercial fishing industry out of Boston”, Massachusetts, and for time spent ashore, “ with the crafts employed at the Boston Naval Ship Yard.”
(h) In 1958, a new chairman of the Region 3 Wage Board was appointed; the new chairman reviewed previous practices ; discussed wage rates and procedures for setting wage rates with representatives of the crew of the Delaware,[10] the *797 project leader of the Delaware and members of his staff, and members of the Wage Board; and, in general, undertook a reevaluation of prior Wage Board practices toward vessel employees. The new chairman gave consideration to setting wage rates for vessel employees based on earnings of oceanographic research vessel employees of the Woods Hole Oceanographic Institution, but, in discussion with representatives of the crew of the Delaware, he was told that work on the Delaware was not comparable to that aboard Woods Hole Oceanographic Institution vessels, and that the said representatives did not desire to have “their wages compared with those vessels.” Thus, the procedure theretofore utilized was continued in 1958.
17. (a) Effective February 2,1959, the Regional Director, Region 3, named a new chairman[11] to succeed the 1958 chairman of the Wage Board; the two members and two alternate members of the prior Wage Board continued to serve on the Wage Board.
(b) A wage rate schedule covering employees aboard the Delaware was promulgated by the Wage Board (and signed by the new chairman) in February 1959. This schedule had been prepared by the prior Wage Board.
(c) While the February 1959 wage rate schedule is not in evidence, the new chairman testified that in preparing the 1959 schedule the Wage Board ascertained the average hourly earnings of fishermen in the large (17-man) Boston otter trawler fleet; that perhaps as many as 27 vessels were utilized in the computation for 1959; that the hourly rate so ascertained was then applied to the number of days expected to be worked at sea by Delaware employees, utilizing a 12-hour workday; that the Wage Board derived a composite hourly rate for work ashore from existing rates paid employees of the Boston Naval Shipyard for various types of work (chipping, caulking, painting, welding, and the like) and the anticipated work ashore of Delaware employees (see finding 18 (f), infra); that that hourly rate was then applied to the number of hours expected to be worked in port by Delcmare *798 employees, utilizing a 40-hour work week; and that the resulting sums of the two calculations represented an annual salary rate for fishermen. Adjustments to the basic annual salary rate were then made to arrive at annual salary rates for other personnel aboard the Delaware. See finding 18(f), infra.
(d) None of the time included in the 1959, or any other, wage rate schedule promulgated by the Wage Board during the period 1959-1965 was calculated at an overtime or “premium” rate, there being no such thing as overtime in the commercial fishing industry. The new chairman relied on verbal advice from other Wage Board members that “this was the practice to be followed.”[12] He was aware of no written authorization or directive that the fishing industry practices were to be utilized in determining plaintiffs’ wages.
(e) In 1959 (and for some years thereafter) the Wage Board in fact utilized a “hybrid” method of arriving at wage rates, because, the new chairman testified, “we have a hybrid operation.” In 1959, and thereafter throughout the period here material, no effort was made to relate wage rates for Delaware [or after 1962, Albatross ZF] employees with prevailing wage rates for employees in any segment of what plaintiffs term the “non-fishing ocean going commercial maritime industry.”
(f) The evidence indicates that, at the outset of his tenure as chairman of the Wage Board, the new chairman knew little or nothing about the duties and responsibilities of employees serving at sea aboard Boston otter trawlers or aboard the Delaware, but that, during such tenure, other members of the Wage Board explained to him the duties and responsibilities of “our men as compared to those on commercial fishing vessels.” As of 1968, he had never been aboard a commercial fishing vessel on a fishing cruise; he had been aboard the Delaware and Albatross IV, in port and on cruises, though not on either vessel during a scientific mission. He had no experiences aboard oceangoing commercial dry cargo or tanker vessels.
*799 (g) At the outset of his tenure as chairman in 1959, he was not familiar with equipment aboard the Delaware, but by 1960 he was generally familiar with such equipment. He did not make a comparison of equipment aboard the Delaware or Albatross IV with equipment aboard other vessels.
(h) In reaching determinations as to wage rates for vessel employees aboard the Albatross IV and Delaware throughout the period here material, the Wage Board acted as a group; each member had an equal voice, participated, and made recommendations; there were no divisions of opinion; and the determinations reached represented the unanimous opinion of the Wage Board. The Wage Board was 'unanimously of the view that all such vessel employees were engaged in “fishing operations,” and uniformly looked to “the fishing industry to relate the duties of our people with the hourly rate which should be paid.” In promulgating wage rate schedules throughout the period here material, the Wage Board considered all of the duties and responsibilities of vessel employees aboard the Delatoare and Albatross IV, and compared them with the duties and responsibilities of employees in the commercial fishing industry.
(i) The chairman of the Wage Board never made a formal study comparing the duties of engineers aboard the Delaware or Albatross IV with the duties of engineers aboard other vessels; there was general agreement among the Wage Board members that the duties of engineers aboard the two named vessels were similar to those of engineers aboard Boston otter trawlers. There was also general agreement among them that the fishing industry was part of the maritime industry.
(j) At least one member of the Wage Board throughout the period here material had considerable experience in the commercial fishing industry prior to employment with the Bureau of Commercial Fisheries, including service on large otter trawlers. His experience on commercial fishing vessels included service as deckhand, assistant engineer, and mate. He had sailed on the Delaware, during vessel cruises, on many occasions; while he had never sailed on the Albatross IV, he was familiar with equipment aboard the Albatross IV. *800 In Ms opinion, that equipment did not significantly differ in operations from equipment aboard a large Boston otter trawler.
(k) Of the two members and two alternate members of the 1958 Wage Board, one member and one alternate member remained on the Wage Board throughout the period here material.
(l) The record does not establish that any lack of knowledge on the part of the Wage Board chairman throughout the period here material resulted in invalid, arbitrary or capricious determinations by the Wage Board or the Regional Director, Region 3.
18. (a) The Wage Board generally promulgated a wage rate schedule covering employees aboard the Delomare (and, later, the Albatross IV) annually.
(b) The 1959 wage rate schedule referred to in finding 17 (b), swpra, was superseded by a new wage rate schedule effective May 1,1960.
(c) Prior to promulgation of the 1960 wage rate schedule, the Wage Board received a survey of wages covering “all available information on landings in 1959 for” large Boston otter trawlers. The Wage Board then prepared proposed wage rates for 1960 (using an estimate of 200 days at sea and 80 days in port) and forwarded the proposed schedule to representatives[13] of personnel aboard the Delaware for comment.
(d) The Wage Board was advised by the said representatives that both the proposed method of establishing basic sea ¡and shore duty hourly pay and the proposed method of adjusting for various vessel positions were satisfactory, except for the captain’s position, but that the estimated work days at sea and ashore were much too low, with consequent unjustified downward impact on proposed annual salary rates. The proposed captain’s salary, the Wage Board was told, did not “reflect a true prevailing wage in the commercial industry for his position.”
(e) The Wage Board met with Delaware representatives *801 to discuss the proposed 1960 wage rate schedule, and, thereafter, again met to consider the proposals made by said representatives. The Wage Board agreed to add 15 shore days to the prior estimate of 80, and to adopt a new formula for establishing the captain’s salary (25 percent more than that of the first officer of the Delaware) .[14] The results (in terms of annual salary rates for each position) were communicated to the Delaware representatives, along with advice that since the new rates (intended to be effective March 20, 1960) involved a salary reduction for each Delaware employee except the captain, a 30-day advance notice to veterans was required and that, accordingly, the new rates would be effective May 1, 1960. The Delaware representatives thereupon advised the Wage Board that the (revised) proposed wage rates “are accepted for the officers and crew members of the M/V Delaware for the year 1960.”
(f) The 1960 wage rate schedule “accepted” was prepared in essentially the same method as the 1959 schedule, utilizing an estimate of 200 days at sea, 12 hours per day, and 95 days in port, 8 hours per day, 5 days a week. The earnings of individual fishermen on 27 large Boston otter trawlers were used to develop the hourly “sea pay rate” for a Delaware fisherman ; hourly shore rates for a Delaware fisherman were developed from “the Boston Naval Shipyard schedule on a basis of 40% chipper, caulker, painter; 20% stevedore; 20% rigger; and 20% laborer.” The two figures derived from the computations resulted in a fisherman’s annual salary rate. For vessel employees other than fishermen, the “basic [Delaware] fisherman’s sea pay was used as a basis for establishing rates”, with other factors, “such as bonus arrangements for individual trips, degrees of responsibility, average percentage decreases, and related items” considered in computing such annual salaries.[15]
19. (a) The Wage Board met twice during May 1961 to discuss vessel wage rates. The Wage Board tentatively de *802 termined new rates, on the average 1.93 percent less than those contained in the 1960 wage rate schedule covering employees aboard the Delaware. The proposed rates were based on a survey of prevailing earning rates of fishermen aboard 24 large Boston otter trawlers (for sea days) and on “prevailing shore rates at the Boston Naval Shipyard” for shore pay, using an estimated vessel schedule of 210 days at sea, 12 hours per day, and 85 days ashore, 8 hours per day. For the chief engineer, assistant engineer, and cook, the hourly shore rate was slightly higher than that for other personnel, for reasons not explained by the record. For vessel employees other than fishermen, the proposed rates were computed in the same manner as in 1960.
(b) Because using the results of the 1961 wage rate survey would have caused a slight decrease in Delaware vessel wage rates, the Regional Director, Region 3, decided to continue the 1960 wage rate schedule in effect until further notice. Copies of a memorandum from the Regional Director advising that the 1960 wage rate schedule would be continued in effect (and that the indicated decrease in vessel wage rates would not be effectuated) were prepared for distribution to each employee aboard the Delaware.
20. (a) The 1960 wage rate schedule covering employees aboard the Delaware was superseded by a new wage rate schedule effective July 22,1962, prescribing base annual rates for employees aboard the Delaware and the Albatross IV (which had been launched in April 1962).
(b) Prior to promulgation of the 1962 wage rate schedule the Wage Board received wage rate data covering large Boston otter trawlers. Proposed wage rates for 1962 were then prepared for each vessel, based on the average earnings of fishermen on large Boston otter trawlers which made 28 or more trips during the year. The average number of trips per commercial vessel was 29, and the Wage Board proposed wage rates “at the rate which commercial fishermen receive for 290 days at sea”, thus eliminating use of shore rates “based on the Boston Naval Shipyard.” In the proposed wage rates, a new formula for officer personnel on the Delaware was also adopted, as follows:
*803 Master — 150% of fisherman rate
Chief engineer — 120% of fisherman rate
First officer — 115% of fisherman rate
Second officer — 110% of fisherman rate
First assistant engineer — 110% of fisherman rate
Second assistant engineer — 105% of fisherman rate
Cook — 110% of fisherman rate
The Wage Board also proposed, inter alia, to pay a differential [16] to officers on the Albatross /F, 10 percent for the master, and 5 percent for other officer personnel.
(c) The Wage Board then discussed the proposed wage rate schedule with vessel representatives,[17] who raised certain objections and questioned closely the basis for establishing a differential for officer pay on the Albatross IV. While the discussion resulted in little or no change in the Wage Board’s proposed wage rate schedule, it did result in a decision by the Wage Board to consider the second assistant engineer aboard the Delaware as a first assistant engineer, and in agreement that, in future years, wage rate information should be gathered jointly by government and vessel representatives; that such information should be gathered on a calendar year basis and placed in effect about July 1 of each year; and that abolition of shore rates was not objectionable.
21. (a) The 1962 wage rate schedule covering employees aboard the Delaware and Albatross IV was superseded by a new wage rate schedule covering both vessels effective July 7, 1963.
(b) Wage rates for 1963 for each vessel (discussed with vessel representatives prior to promulgation) were based on the 5-year average earnings of fishermen on large Boston otter trawlers which made 28 or more trips during the year, “to iron out severe fluctuations in the vessel wage rates through *804 out the years.” The formula for officer personnel used in 1962 was followed, except that chief engineers of both vessels were to receive 130 percent of fishermen’s rate; and that only the master and chief engineer on the Albatross IV received a differential (10 percent and 5 percent, respectively). The Wage Board rejected the request of vessel representatives that 1963 wage rates be based exclusively on the results of a 1962 wage rate survey; honoring it would have resulted in a base pay for a fisherman of $8,034, rather than $7,780, using a 5-year average.
22. (a) The 1968 wage bate schedule covering employees aboard the Delaware and Albatross IV was superseded by a new wage rate schedule effective July 5, 1964.
(b) By 1964, three different employee organizations had requested “exclusive recognition” under Executive Order No. 10988, Employee-Management Cooperation in the Federal Service, among employees aboard the Delaware and Albatross IV. These organizations sought different “appropriate units” for exclusive recognition purposes. The Bureau of Commercial Fisheries (and the Department of the Interior) determined that such “appropriate units” consisted of all crew members aboard the Delaware (except the master), and of all crew members aboard the Albatross IV (except the master). Two of the employee organizations requested arbitration under Executive Order No. 10988, and, in mid-1964, the unit issue remained unresolved. The Wage Board therefore promulgated the 1964 wage rate schedule (based on annual operations of large Boston otter trawlers which had made 28 or more trips during calendar year 1963) without consultation of any employee organization.
23. (a) For personnel aboard both the Delaware and the Albatross IV throughout the period here material, wage rate schedules promulgated by the Wage Board (and approved by the Regional Director, Region 3), were designed to compensate such personnel for all (or more than all) hours expected to be worked; 1960 and 1961 wage rate schedules were calculated using 200-210 days at sea (12 hours per day), and 85-95 days ashore (8 hours per day); thereafter, wage rate schedules were calculated using 290 12-hour days.
*805 (b) No such wage rate schedule reflected any element of “premium” or overtime pay for work at sea in excess of 8 hours per weekday, or on Saturdays, Sundays, or holidays, because there was no such thing as overtime in the commercial fishing industry and the Wage Board looked to the commercial fishing industry as the basis for fixing “sea pay” wage rates.
(c) The monthly salary check of an employee aboard either vessel was not affected by whether he worked less, or more, hours during a particular time period than contemplated by the wage rate schedule in effect at that time. With the possible exception of 1960, wage rate schedules throughout the period here material contemplated payment for more hours than actually worked by personnel aboard the Delaware and, after 1962, by personnel aboard the Albatross /F, assuming each such employee actually worked 12 hours each day at sea.
24. (a) Following arbitration -under Executive Order No. 10988 as to the appropriate unit (finding 22(b), supra), an election was held to determine an exclusive representative for engineers aboard the Delaware and Albatross IV, and one of the competing employee organizations was elected exclusive representative for all engineers aboard the two vessels.[18]
(b) Effective July 22, 1965, the exclusive representative and the Regional Director, Region 3, entered into a basic agreement covering engineers aboard the two vessels; in it, both parties agreed to establish procedures for the purpose, inter alia, of providing “for fair and reasonable rates of pay in accordance with prevailing rates and practices in the Maritime industry”; ¡both further agreed, where rates of pay affecting covered employees were to be determined through collective bargaining, to “be guided by the principle of conforming to prevailing maritime rates and practices as nearly as is consistent with the public interest ¡in the locality of the Vessels’ area of operations in accordance with 5 TTSC 1082 (8).” Any negotiated rates of pay were to be promulgated in the form of supplements to the basic agreement.
(c) By Supplemental Agreement No. 1, effective December 17, 1965, between the exclusive representative and the *806 Regional Director, Region 3, negotiated rates for engineers aboard the Albatross IV and Delaware were promulgated. Neither party waived “any legal rights or actions which existed prior to the execution hereof and hereby reserve all such rights and actions.” Supplemental Agreement No. 1 provided, inter alia, that engineers aboard the Delaware were to receive 91 percent of the pay of engineers aboard the Albatross IV; and stated an annual rate of pay (based on an assumed schedule of 210 days at sea) for engineer positions aboard both vessels. The stated annual wage covered Saturday and Sunday work at sea; regular sea watches of 4 hours on and 8 hours off, including weekend and holiday work; and additional work performed outside regular watches by all engineers and paperwork by the chief engineer. All engineers were to be regular watch standers, with no overtime to be paid at sea regardless of hours actually worked, with one exception.[19] Supplemental Agreement No. 1 remained in force to May 23, 1967. Following May 23, 1967, the salaries to be paid engineers aboard the Albatross IV and Delaware have been set forth in other supplemental agreements.
25. (a) Throughout the period here material, a large (17-man) otter trawler fleet operated out of Boston. In 1960 this fleet contained some 27 such vessels, and in 1961 it contained some 24 such vessels.
(b) A typical large Boston otter trawler was 100 to 150 feet long; its gross tonnage varied from 200 to 300; and its horsepower ranged from 500 to 1,000. A typical commercial fishing voyage aboard such a vessel lasted 10 days or so, and covered 400 to 500 miles. The otter trawler was normally in port, between fishing voyages, 2 to 3 days, and spent some 280 to 300 days a year at sea.
(c) Commercial fishermen aboard such a vessel were compensated on the basis of a portion, or “share”, of a percentage of the proceeds of the catch, the amount of such compensation depending not on the number of hours a fisherman might work during a voyage, nor on vessel size, but on the results *807 (in terms of dollars) of the voyage. Crew members of such a vessel were paid no overtime or “premium” pay for any hours worked while at sea.
(d) Crew members of such a commercial fishing vessel normally did no work in port. When the vessel returned to port, the fish caught during the voyage were sold at auction, crew members were paid a share from the proceeds, and they then had no duties until the next fishing trip. At sea, crew members normally worked 12 hours a day, 6 hours on and 6 off, with two watches in a 24-hour period.
(e) The engineers aboard such a large otter trawler were “on shares”[20] for work at sea. Once the vessel returned to port, the engineers had no duties in port (beyond making a worklist for repairs, pumping out the fish hold and changing fuel filters; “then we go home, we are all through”). An engineer aboard such a large otter trawler did no fishing during a voyage; normally he boarded the fishing vessel shortly prior to sailing to check everything over, and, at sea, stood regular watches, 6 hours on, 6 hours off, with two watches in a 24-hour period, and made sure all equipment on the vessel was in working condition.
26. (a) Throughout the period here material, the Delaware was at sea, on the average, about 210 days per year. The length of Delaware cruises varied from a week to a month or more; while the record is less than complete on this point, the average length of a voyage, so far as can be determined, was nearer a month than a week.
(b) Following its commissioning in 1968, the Albatross IV was at sea about 104 days in 1963, 207 days in 1964, and 227 days in 1965; the vessel was scheduled to be at sea 221 days in 1966. The length of Albatross IV cruises varied from several days to a month or more, with the average length being about 15 days.
(c) The evidence does not establish the average length of a commercial dry cargo or tanker vessel voyage; such voyages last from a few days to 6 or 8 months or longer.
(d) As to Boston otter trawler voyages, see finding 25 (b).
*808 (e) The evidence does not establish an average length of voyage for any other sort of vessel. One AGOR vessel operated by private industry did, however, go on “long trips”, of 3 to 6 months’ duration, and was at sea over 280 days a year.
27. Throughout the period here material, the basic work week for engineers serving aboard the Albatross IV and the Delaware was, in port, 8 hours per day, 40 hours per week (with overtime for work in excess of 40 hours per week directed and performed); at sea the “normal” workday was not less than 8 nor more than 12 hours each day at sea, with no overtime or premium compensation for work in excess of 8 hours per day, 40 hours per week, or on Saturdays, Sundays or holidays.
28. (a) Engineers serving aboard the Delaware and Albatross IV at sea served watches of up to 12 hours per day (including Saturdays, Sundays and holidays) prior to December 17,1965; since December 17,1965, regular sea watches of 4 hours on, 8 hours off (including weekends and holidays), have been in effect for such engineers. See finding 24(c), sufra.
(b) Generally speaking, throughout part or all of the period here material, engineers serving aboard “commercial maritime” non-fishing dry cargo vessels and tankers, at least some AGOR vessels operated by private industry, and vessels operated by the Military Sea Transportation Service, Department of the Navy (MSTS) and certain other government agencies, stood two watches of 4 hours on, 8 hours off, each 24-hour period at sea, with any time worked beyond 8 hours per day, 40 hours per week, or on Saturdays, Sundays, or holidays, compensated at a premium or overtime rate.
29. (a) The crew of a large Boston otter trawler (17 men) was slightly larger than that of the Delaware and slightly smaller than that of the Albatross IV (see findings 7(d), 8(c), supra). Included among the crew aboard the otter trawler were some 12 fishermen; a second officer, second assistant engineer, oiler, chief steward, and mess attendant were normally not so included.[21]
*809 (b) While there is testimony in the record that the crew of an “average” dry cargo vessel totals 38 to 42 men, the record does not support accurate conclusions as to size and complete composition of the crew of commercial, non-fishing, dry cargo vessels or tankers.[22]
(c) An AGON vessel operated by private industry, of about 1,000 horsepower and unestablished size, has a 27-man crew, including four engineers, four licensed deck officers, a radio operator, three oilers, nine seamen, perhaps a boatswain, and a stewards’ department which includes a steward, a cook, and “a couple of messmen.”
30. (a) Throughout the period here material, personnel employed in the commercial fishing industry did not receive paid vacations.
(b) Personnel employed aboard commercial, non-fishing, dry cargo and tanker vessels, and AGOR vessels operated by private industry, who met the conditions specified in “union” agreements received vacation benefits as specified in such agreements.
(c) Plaintiffs, as government employees, have been and are entitled to annual and sick leave benefits normally accorded such employees, and, since November 1966, have additionally been eligible for leave of absence (as specified in finding 37, infra).
31. (a) Engineers serving aboard the Albatross IV were required by the Bureau of Commercial Fisheries to possess licenses issued by the Coast Guard covering at least a 1,000 horsepower vessel; engineers serving aboard the Delaware were not so required, although possession of an appropriate license was an advantage in consideration for employment. Findings 9,11, supra.
(b) Engineers serving aboard large commercial fishing vessels were required to have a Coast Guard license. The record suggests, however, that such licenses would cover only fishing vessels of particular horsepower rating.
*810 (c) Precise license requirements for engineers serving on other types of vessels (dry cargo, tanker, etc.) are not established by the record, nor does the record indicate whether an engineer generally qualified to serve, and serving, aboard the Delaware or Albatross IV would be qualified, insofar as license is concerned, to serve aboard such other types of vessels.[23]
32. The evidence does not reflect qualification standards or requirements, in terms of education, training, experience, etc., for engineer positions aboard Boston otter trawlers, or for such positions aboard commercial dry cargo vessels or tankers, AGOB, vessels operated by private industry, or other non-fishing vessels. The evidence does not reflect in any qualitative or quantitative manner, but only in general conclusory form of no real probative value,[24] the duties, responsibilities, working conditions, and character of work of engineers serving at sea aboard commercial dry cargo or tanker vessels, AGOB vessels operated by private industry, or other non-fishing vessels.
33. (a) Unlike engineers aboard large Boston otter trawlers who did little or no work in port (finding 25(d), supra), engineers aboard the Delaware and Albatross IV regularly worked 40 hours a week in port, performing maintenance and repair work.
(b) Engineers aboard the Delaware and Albatross IV also maintained sea logs, work logs, and port logs, a duty not required of engineers aboard large Boston otter trawlers. Neither an engineer aboard the Albatross IV nor one aboard such a commercial fishing vessel actually engaged in fishing operations during a cruise. The stated duties of an engineer aboard the Delaware included assisting “in fishing operations when required.”
*811 34. (a) Aboard both, large Boston otter trawlers and the vessels here in suit at sea engineers were responsible for the operation and maintenance of equipment under their jurisdiction. There is evidence in the record that much of such equipment aboard the Albatross TV is not normally found aboard a commercial fishing vessel, and that some of this equipment would or could be found on what plaintiffs term “commercial non-fishing maritime tanker and dry cargo vessels”. On the record as a whole, this evidence is of no real probative value. The witnesses who so testified (plaintiffs who jointly prepared a written list, in evidence, of equipment aboard the Albatross IV as compared with that aboard a commercial fishing vessel) either had no commercial fishing experience at all or had had none for many years. Their method of ascertaining commercial fishing vessel equipment is of doubtful reliability.[25] While the equipment normally to be found aboard commercial maritime tanker and dry cargo vessels varied depending on the size and age of the vessel (and perhaps of the vessel’s nature), the record does not develop any such variances. There are discrepancies between oral testimony and the written list. The evidence is for the most part limited simply to items, taking into account no differences in size, sophistication or complexity, nor anything else. Much of the equipment aboard the Albatross IV is not normally found aboard such non-fishing vessels. See also finding 17 (j), supra.
(b) There is evidence in the record that a limited amount of equipment aboard the Delaware maintained and operated by engineers is not normally found aboard a Boston otter trawler. The record does not establish that any of the said equipment aboard the Delaware is normally found aboard such non-fishing vessels.
35. (a) On the evidence as a whole, conclusory testimony that engineers serving aboard the Albatross IV performed “similar”, “identical”, or “the same” work as engineers aboard AGOB. vessels operated by private industry, or research ves- *812 seis operated by MSTS, is of no real probative value. The record does not establish that, in terms of duties, responsibilities, working conditions, character of work, or otherwise, engineers serving at sea aboard the Albatross IV were in any significant manner comparable to engineers serving at sea aboard commercial dry cargo vessels or tankers, AGOE vessels operated by private industry, or MSTS or other government vessels.
(b) The record does not establish that engineers serving at sea aboard the Delaware were, in terms of duties, responsibilities, working conditions, character of work, or otherwise, in any manner comparable to engineers serving at sea aboard commercial dry cargo vessels or tankers, AGOE vessels operated by private industry, or MSTS or other government vessels.
(c) In terms of duties, responsibilities, working conditions, character of work and the like, engineers serving at sea aboard the Albatross IV and Delaware were obviously not identical to engineers serving at sea aboard large Boston otter trawlers. Upon consideration of the nature of operations aboard the Albatross IV and Delaware, the average lengths and purposes of their voyages, the vessels themselves, and all other relevant factors disclosed by the evidence, however, the record fails to establish that the actions of the Eegional Director, Eegion 3, and the Wage Board here in question were invalid, arbitrary, or capricious.
36. (a) Persons employed by defendant following 1959 to work aboard the Delaware or Albatross IV were advised of conditions of employment and wages to be paid prior to commencing work on such vessels.
(b) There is evidence in the record that on occasion some plaintiffs complained to their representatives (in the nontechnical sense), and occasionally to government personnel, concerning wage rates set by the Eegion 3 Wage Board, but it cannot be concluded that throughout the period here material and prior to 1965, there was any real complaint over the method (looking to “the fishing industry”) utilized by the Eegion 3 Wage Board in establishing rates of pay for *813 vessel employees.[26] Complaints and claims followed the appearance on the scene about 1964 of employee organization representatives seeking to represent segments of the crew of the two vessels in suit.
(c) Defendant has offered no evidence to show damage or prejudice to it as a result of the timing by plaintiffs of the assertion of the claims herein.
37. (a) By Public Law No. 89-747,80 Stat. 1179, 5 U.S.C. § 6805 (Supp. V, 1965-69), Congress provided that any government officer or crew member “serving aboard an oceangoing vessel on an extended voyage may be granted leave of absence,” under regulations of the Civil Service Commission, at a rate not to exceed 2 days for each 30 calendar days of such service, without regard to other leave authorized by “this subchapter.”
(b) Civil Service Commission regulations define an “oceangoing vessel” as including, inter alia, a vessel in use on the high seas or the Great Lakes, and an “extended voyage” as one of not less than 7 consecutive days’ duration. Pursuant to such law and regulations, employees aboard the Delaware and Albatross IV are eligible for this “leave of absence.”
(e) House Eeport No. 2200, 89th Congress, 2d Session, reflects that Federal seafaring personnel number approximately 10,000, 90 percent of whom are in the Military Sea Transportation Service; the remainder man, inter alia, research and survey ships of the Departments of the Interior and Commerce. House Eeport No. 2200 includes this statement : “These civilian maritime employees are paid in accordance with prevailing industry rates, but their leave benefits, which are the same as for other Federal employees, are substantially less favorable than leave benefits of crewmen in the maritime industry.”
*814 38. There is conflicting evidence in the record whether, to men who have spent many years at sea or in occupations related to the sea, the term “the maritime industry” includes, or excludes, the commercial fishing industry. Upon a weighing of the whole record, including testimony of a knowledgeable union official that the maritime industry encompasses “everything that floats,” it is concluded that in common parlance among such men the maritime industry is a broad term within which the commercial fishing industry is a segment.
Conclusion oe Law
Upon the foregoing findings of fact and conclusions of law which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are not entitled to recover and the petitions are dismissed.

 These cases hare been consolidated with Walter E. Beatteay, et al. v. United States, No. 337-66; Gerald Benham, et al. v. United States, No. 78-67; and Meredith Clapp, et al. v. United States, No. 226-68, but are separately reported to the court. Finding 1, note 1.

 The commissioner’s reports in cases No. 337-66, 78-67 and 226-68 have been adopted by orders of the court dated and announced the same date as that of this opinion [footnote by the court].

 The petitions herein were filed May 26, 1966; August 12, 1966; and January 27, 1967, respectively. The claims sued on extend only to December 16, 1965. See 28 U.S.C. § 2501 (1964); Findings 3, 24; Daniels v. United States, 187 Ct. Cl. 38, 40, 407 F.2d 1345, 1346 (1969).

 With the approval of the late Commissioner Richard Arens, who presided at trial and closed proof, It was agreed (1) that the court’s determination on defendant’s liability to plaintiffs whose claims are based on employment on the two named vessels “shall be applicable to and binding on plaintiffs in the aforesaid cases” whose claims are based on employment on other Bureau of Commercial Eisheries vessels, and (2) that trial would be limited to the issues of law and fact relating to the right to recover, reserving determination of the amount of recovery, if any, for further proceedings.

 Recodified as 5 TJ.S.C. § 5342(a) (Supp. V, 1965-69).

 Plaintiffs’ claim relates only to hours worked at sea; there Is no claim concerning any work in port.

 Compare Cape Shore Fish Co. v. United States, 165 Ct. Cl. 630, 634, 330 F. 2d 961 , 963-4 (1964); United States v. W. M. Webb, Inc., 397 U.S. 179 (1970).

 Plaintiffs’ Main Brief, p. 30.

 Plaintiffs’ Main Brief, pp. 12-13.

 Plaintiffs* Main Brief, pp. 5-6.

 See, e.g., findings 7, 8,13,15(b), 25.

 A lesser showing has been made as to engineers aboard the Delaware at sea.

 This contention, advanced at pp. 27-29 of Plaintiffs’ Main Brief to support the argument that defendant “violated” Section 202(8), also appears as a separate line of argument at pp. 43-48 of Plaintiffs’ Main Brief.

 Revoked by Executive Order No. 11491, Labor-Management Relations in the Federal Service, October 29,1969, 34 Fed. Reg. 17605.

 Plaintiffs’ Main Brief, pp. 46-47 (emphasis in original).

 See finding 37 (c).

 Plaintiffs’ Main Brief, p. 34.

 Plaintiffs’ Main Brief, p. 41.

 Daniels v. United States, supra, 187 Ct. Cl. at 42, 407 F.2d at 1347 (emphasis supplied); Plaintiffs’ Main Brief, p. 39.

 Representatives (the -word is not used in any technical, labor-law, sense) of the crew of the Delaware did not desire to have “their wages compared with those vessels.” Finding 16(b). Interestingly enough, plaintiffs apparently still do not, for the record is essentially barren of reference to Woods Hole Oceanographic Institution vessels.

 Recodified in 5 U.S.C. §§ 5544(a), 5544(a)(1), and 6102 (Supp. V, 1965-69).

 Plaintiffs’ Main Brief, p. 10.

 Recodified in 5 U.S.C. §§ 5541(2) (xl), 5544(a) (first sentence), 5544 (a)(2)(3) (Supp. V, 1965-69).

 Defendant’s Brief, p. 6.

 These cases have been consolidated with Walter B. Beatteay, et al. v. United States, No. 337-66; Gerald Benham, et al. v. United States, No. 78-67; and Meredith Clapp, et al. v. United States, No. 226-68. Plaintiffs in Beatteay, and in Benham, and Clapp, deck officers and crew members, and represented by other counsel, have filed separate requested findings of fact and briefs, and those cases are separately reported to the court this day.

 While plaintiffs herein (as defined in finding 4) de not explicitly so state, their claims extend only to December 16,1965. See finding 24, infra.

 Organization of the Bureau was not completed for some time after 1956.

 Experience on commercial fishing trawlers -was at least “desirable”, insofar as engineers were concerned; each permanent Delaware crew member had had sneh experience.

 The vessel was complete with laboratory space for biological, chemical and oceanographic research, and specially eguipped therefor. Hold capacity was negligible in comparison with that of commercial fishing vessels.

 The omission of “or fishing” here appears to have been an inadvertent one. Findings as to qualification standards (and duties) of engineer positions aboard the Delaware are derived from proposed “Qualification Standards for Vessel Positions” dated January 30, 1956. Defendant has offered no objection to plaintiffs’ requested findings based thereon, and the record justifies the inference that, while not officially promulgated, the proposed 1956 qualification standards (and duties) for engineers aboard the Delaware were in effect throughout the period here material.

 Findings 10(a), (b), and (e) are derived from proposed “Qualification Standards for Vessel Positions”, dated January 30, 1956. See note 6, supra.

 Findings 11 and 12 are derived from Interior Department Qualification Standards, Vessel Positions, Ungraded (Research Vessel Albatross IV), approved October 1,1962.

 Authority to approve wage rates for ungraded positions was at that tíme vested In the Director of Personnel.

 The word “representatives” is not used in any technical, labor-law, sense. There was, in 1958 and thereafter, at least some “union” organization of Delaware personnel; at least one plaintiff (and perhaps more) and a national representative of the “union.” participated in 1958 wage rate discussions with the new chairman ; there was also participation, by plaintiffs aboard the Delaware and Albatross IT, and the national representative of the “union”, in wage rate discussions in subsequent years.

 The new chairman had been employed by the Bureau of Commercial Fisheries January 15,1959.

 He was aware, in 1959, that commercial fishermen did not work in port and received no overtime for hours worked at sea.

 Here, as elsewhere herein, the word Is not used In any technical sense, unless the context so Indicates.

 The Wage Board had expressed the view, In May 1958, that the position of captain, or master, could not be compared with similar positions In the Boston otter trawler fleet, and that that position had duties and responsibilities comparable to a grade GS-12 position, but agreed to, and did, reexamine “the basic formula” In 1960.

 See also finding 19(a), infra.

 The differential was based on the Wage Board’s determination that the Albatross 17 had a higher classification than the Delaware; this is not consistent with commercial fishing industry practice, where wages are unrelated to vessel size.

 Executive Order No. 10988, Employee-Management Cooperation in the Federal Service, was promulgated January 17,1962. The extent, if any, to which discussions in 1962 and 1963 were with an “employee organization” granted informal or formal recognition under that Executive Order does not appear. Compare finding 24, infra.

 Six engineers were eligible to vote in the election.

 Where less than three engineers were available for watch standing, overtime (at a stated rate) was to be paid for standing watches in excess of 8 hours per day.

 The record justifies the Inference that during the period here material the engineers aboard a large otter trawler In the Boston fleet received a fisherman’s share plus a “bonus” for each fishing trip.

 Normally, such an otter trawler carried no scientists.

 The power tonnage (gross tons plus horsepower) of dry cargo vessels ranges from "Less than 3,501” to “35,001 and over” for twin screw vessels, and from “Less than 5,001” to “25,001 and over” for single screw vessels. Tankers range from “12,000 and under” to “25,001 to 38,000” (or more) power tonnage. Power tonnage of each of the vessels in suit (and of Boston otter trawlers) Is under 2,100.

 There Is testimony that one such engineer could serve on any American vessel up to 4,500 horsepower.

 For example, as to equipment, an engineer is responsible for maintaining two main engines aboard the Albatross IV, one main engine aboard a Boston otter trawler, and “main engines” aboard commercial tanker and dry cargo vessels ; the number of ships service generators (also an engineer responsibility) are three, two, two, and unstated for the Albatross IV, a Boston otter trawler, the Delaware, and commercial tanker and dry cargo vessels, respectively; nothing more appears. See also finding 34, infra.

 The commercial fishing vessel described in the list, for purposes of comparison, was admittedly not “very modern.”

 In 1963 an assertion -was made by a union “representative” that under the Work Hours Act of 1962, Pub. L. No. 87-581, 76 Stat. 357, premium pay was due for work at sea In excess of 40 hours per week. That contention Is not pressed here. One plaintiff, president of a “union” organization of employees aboard the Delaware, testified that he had Investigated the use of a different segment of the maritime Industry for wage rate schedule purposes, but never so proposed to the Bureau; he too looked to “the fishing Industry”, and had no objection to the Region 3 Wage Board’s use of the fishing fleet income data.