**Seymour BARATT et al.**

v.

**The UNITED STATES.**

**No. 415–75.**

United States Court of Claims.

Oct. 18, 1978.

is clear that more than the bare text was weighed in our evaluation.

Howard A. Topel, Washington, D. C., for plaintiffs; Eugene F. Mullin, Washington, D. C., atty. of record. Mullin, Connor & Rhyne, P. C., and Daniel E. Matthews, Washington, D. C., of counsel.

Donnie Hoover, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant; Bonnie L. Gay, Washington, D.C., of counsel.

Before FRIEDMAN, Chief Judge, SKELTON, Senior Judge, and KASHIWA, Judge.

## ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

KASHIWA, Judge.

This back pay case is before the court on cross motions for summary judgment. Both parties submit there is no genuine issue as to any material fact and both contend they are entitled to have summary judgment granted in their favor. After a

careful review of the briefs and oral arguments presented, we grant defendant's motion for summary judgment for the reasons hereinafter stated.

Plaintiffs in this proceeding are foremen and assistant foremen (hereinafter sometimes referred to as supervisors) in the Currency Overprinting Section of the Bureau of Engraving and Printing (hereinafter referred to as BEP) of the Department of Treasury. They challenge as arbitrary and capricious and contrary to statutory standards a May 11, 1970, wage determination of the Department of Treasury.[1] The disputed determination, although not causing an actual reduction in any employee's wage, adjusted the formula for computing plaintiffs' future salaries resulting in a lessening of the pay to which they would subsequently be entitled for working as supervisors in the Currency Overprinting Section of the BEP.

The genesis of the present dispute is traceable to a June 12, 1964, Government Printing Office memorandum from the Director of Personnel to the Administrative Assistant to the Public Printer. This memorandum dealt with the establishment of adequate pay rates for supervisory personnel employed in the Government Printing Office (hereinafter referred to as GPO). It led to the establishment of a pay formula for GPO supervisory personnel based upon the "basic journeyman pay of the journeymen supervised." Under the GPO formula foremen and assistant foremen were to be paid 30 percent and 20 percent, respectively, above the base wage of the basic journeyman craft supervised. See Exhibit 7 of plaintiffs' brief.

The BEP, which generally follows the GPO in fixing its pay scale, adopted the same formula, with Treasury approval, for paying its supervisory personnel. However, when the GPO supervisory pay formula was initially adopted by BEP, the Currency Overprinting supervisors (plaintiffs) had

their wage computed by applying the 30 percent and 20 percent differentials to the base pay of a journeyman pressman working as Currency Overprinting pressman (a premium position earning a wage above the basic journeyman pressman wage, see Exhibit 5 of plaintiffs' brief) without considering that a Currency Overprinting pressman was a premium rate employee. The effect was that the Currency Overprinting supervisors were paid on the basis of the base wage of the journeymen actually supervised rather than on the base wage of the basic journeyman craft supervised (the journeyman pressman craft) resulting in a higher wage for the supervisors of the Currency Overprinting Section. This continued until 1970.

In 1970 the GPO revised the pay formula for GPO supervisory personnel adding a 5 percent increase in the basic journeyman wage before the 30 percent and 20 percent differentials were applied. The purpose of the 5 percent increase was to increase the wage of GPO supervisory personnel, thus decreasing a perceived excessive salary gap between the position of foreman and assistant superintendent. Memorandum from Administrative Assistant to the Public Printer (February 3, 1970) (Exhibit 9 of plaintiffs' brief).

In 1970 BEP moved to adopt the 1970 GPO change in the pay formula for supervisory personnel. In reviewing the BEP supervisory pay formula in implementing the change, the Director of BEP, James A. Conlon, discovered that the supervisors of the Currency Overprinting Section were having their wage rate determined by applying the 30 percent and 20 percent differentials to the premium wage earned by Currency Overprinting pressmen rather than applying it to the base wage of the basic journeyman craft supervised (the journeyman pressman craft). The Director of BEP considered this a past administrative error[2]

---

1. Throughout the period in dispute the Department of Treasury was the pay-fixing authority for the BEP and any change in a salary formula or rate recommended by the Director of BEP was not effective until approved by the Department of Treasury.

2. The defendant does not assert a counterclaim herein for the overpayments paid to supervisors from 1964–1970 due to the past administrative error. See *Ahearn v. United States,* 151 Ct.Cl. 21 (1960) *cert. denied,* 364 U.S. 932, 81 S.Ct. 381, 5 L.Ed.2d 366 (1961).

which should be prospectively corrected in order to maintain alignment with the GPO supervisory pay scale and so recommended to the Department of Treasury. Memorandum from James A. Conlon, Director of the Bureau of Engraving and Printing, to A. N. Latham, Jr., Director, Office of Personnel, Department of Treasury (April 16, 1970). The recommendation was approved, along with the 1970 GPO pay formula change, by the Department of Treasury on May 11, 1970. Memorandum from A. N. Latham, Jr., Director of Personnel, Department of Treasury, to James A. Conlon, Director of the Bureau of Engraving and Printing (May 11, 1970).

It is the prospective correction of the Currency Overprinting supervisory pay formula which plaintiffs attack as an arbitrary and capricious administrative action and violative of recognized statutory principles. The plaintiffs appealed the adjustment in the supervisory wage formula to the Director of BEP and subsequently to the Director of Personnel of the Department of Treasury. At both levels they requested a hearing. Both appeals were denied without hearing. The reason given for the denial was that the 1970 prospective correction in the Currency Overprinting supervisory pay formula was necessary in order to maintain the alignment or parity with the supervisory pay formula in effect at GPO. On December 1, 1975, plaintiffs filed the petition currently before us. Here plaintiffs make the same challenge to the prospective correction in the supervisory pay formula as they made at the administrative level. The relief requested is an order granting back pay from the date of the disputed wage determination coupled with a directive to BEP and the Department of Treasury to prospectively discontinue use of the May 11, 1970, Currency Overprinting supervisory pay formula and return to the formula in effect from 1964 to 1970.

Since the disputed prospective correction in the supervisory pay formula was made in 1970, one other significant development occurred in the Currency Overprinting Section of the BEP. In early 1971 BEP commenced testing of the first unit of new printing equipment known as Currency Overprinting Processing Equipment or COPE. After an initial period of testing, inspection, and adjustment the unit was accepted and subsequently six additional COPE units were placed in operation. Currently, most of the printing work in the Currency Overprinting Section is performed with this equipment. Both parties agree that the COPE equipment is highly sophisticated equipment and that its introduction will probably result in substantial cost savings to the Government. Also, it is agreed that there is presently no equipment or printing operation in existence at GPO or in private industry which is comparable to that currently in operation in the Currency Overprinting Section of the BEP.

It is conceded by both parties that plaintiffs, as employees of the BEP, are not subject to the GS classification pay system, 5 U.S.C. § 5102(c)(7) (1970). Instead, plaintiffs are "prevailing rate" federal employees with their pay established pursuant to the provisions of 5 U.S.C. § 5349(a) (Supp. V 1975).[3] Section 5349(a) provides that:

(a) The pay of employees, described under section 5102(c)(7) of this title, in * * *, the Government Printing Office, [and] * * *, the Bureau of Engraving and Printing, * * * *shall be fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates* and in accordance with such provisions of this subchapter, including the provisions of section 5344, relating to retroactive pay, and section 5345, relating to retention of

---

3. From May 11, 1970, until a point in time commencing with the first pay period beginning on or after the 90th day after August 19, 1972, the governing statute was 5 U.S.C.

§ 5341(a) (1970). The parties agree that the minor changes in the governing statutes made by Pub.L. 92–392, § 1(a), 86 Stat. 572 (1972), have no effect on the merits of this case.

pay, as the pay-fixing authority of each such agency may determine. * * * [References to the present codification of this statute include previous codifications where the context requires.] [Emphasis supplied.]

The operative language of the section:

* * * shall be fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates * * *

has remained unchanged since its enactment as part of the Classification Act of 1949, ch. 782, § 202(7), 63 Stat. 955.

In *Amell v. United States*, 384 U.S. 158, 86 S.Ct. 1384, 16 L.Ed.2d 445 (1966), the Supreme Court addressed the question of whether the Court of Claims had jurisdiction over "prevailing rate" employee suits involving federal employees working aboard Government vessels. The applicable prevailing rate statute in *Amell* was the Classification Act of 1949, ch. 782, § 202(8), 63 Stat. 955, *now codified as* 5 U.S.C. § 5348(a) (Supp. V 1975). The question in *Amell* was whether the Suits in Admiralty Act, 41 Stat. 525, *as amended*, 46 U.S.C. §§ 741–752 (1964 ed.), ousted the Court of Claims from exercising its historic jurisdiction over the pay claims involved therein. The Supreme Court held that it did not for the employees working aboard Government vessels were federal employees and not maritime employees.

■ Although the statute involved in this suit is not the same as the one involved in *Amell*, they enjoy a similar derivation. Classification Act of 1949, ch. 782, § 202(7) & (8), 63 Stat. 955; *U.S.Code Cong.Serv.*, 81st Cong., 1st Sess. at 2365, 2368 (1949). The operative language of both provides that the designated federal employees shall have their wage fixed in accordance with the prevailing rates for the type of work involved as nearly as is consistent with the public interest. It follows, and we so hold, that we have jurisdiction to consider the claims involved in this suit on the basis of *Amell*. *See also Blaha v. United States*, 511 F.2d 1165, 206 Ct.Cl. 183, (1975); *Daigle v. United States*, Ct.Cl. No. 264–76 (decided July 14, 1978).

The merits of this case present us with the question of whether the Department of Treasury abused its administrative discretion on May 11, 1970, in approving the BEP's recommended prospective correction to the pay formula by which the pay of the supervisors of the Currency Overprinting Section was fixed. Plaintiffs argue there was such an abuse of discretion for both substantive and procedural reasons. Defendant denies any such abuse of administrative discretion.

■ The general rule is that federal agencies "have discretion in determining most matters relating to the terms and conditions of federal employment." *United States v. Testan*, 424 U.S. 392, 406, 96 S.Ct. 948, 957, 47 L.Ed.2d 114 (1976). In construing the statute presently codified as 5 U.S.C. § 5348(a) (Supp. V 1975), we have held that our review of "prevailing rate" employee cases is limited. See *Daigle v. United States, supra*; *Blaha v. United States, supra*, 511 F.2d at 1167, 206 Ct.Cl. at 189; *Benevento v. United States*, 461 F.2d 1316, 1320, 198 Ct.Cl. 772, 777–778, *cert. denied*, 409 U.S. 1038, 93 S.Ct. 516, 34 L.Ed.2d 486 (1972); *Daniels v. United States*, 407 F.2d 1345, 1347, 187 Ct.Cl. 38, 41 (1969); *Ayres v. United States*, 186 Ct.Cl. 350, 359–360 (1968); *Amell v. United States*, 390 F.2d 880, 182 Ct.Cl. 604, *cert. denied*, 393 U.S. 852, 89 S.Ct. 88, 21 L.Ed.2d 122 (1968). In *Benevento* this court stated that the prevailing rate statute involved therein (now 5 U.S.C. § 5348(a) (Supp. V 1975))

* * * embodies a broad congressional grant of administrative discretion, with a concomitant limited scope of judicial review. "Our concern", * * * "is simply to determine whether plaintiffs have met their heavy burden of proving that the Secretary's action in this instance was so arbitrary as to be clearly wrong." * * * [*Benevento v. United States, supra*, 461 F.2d at 1320, 198 Ct.Cl. at 788.]

Although none of the above cases involved the interpretation or application of the stat-

ute before us in this suit, 5 U.S.C. § 5349(a) (Supp. V 1975), we hold that the rule of limited judicial review announced in those cases is equally applicable in our review of the pay dispute involved in this case under section 5349(a).

In attempting to overcome the burden of showing that the disputed May 11, 1970, wage determination was not reasonable, plaintiffs make a number of assertions. Plaintiffs' main substantive argument is that the asserted alignment of BEP pay scales with GPO's is illusory, because there are no supervisory positions in GPO that are comparable with the supervisory positions in the Currency Overprinting Section of BEP. Citing *Hearne v. United States*, 68 F.Supp. 786, 107 Ct.Cl. 335 (1946), *cert. denied*, 331 U.S. 858, 67 S.Ct. 1752, 91 L.Ed. 1865 (1947), plaintiffs argue had the BEP and Department of Treasury undertaken an independent investigation and analysis of the nature of the supervisory work in the Currency Overprinting Section before making the disputed May 11, 1970, wage determination, they would have realized that the supervisory positions at GPO were not comparable to those in the Currency Overprinting Section. Thus, they would have realized that the supervisory pay formula in effect at GPO was not suitable for the supervisory positions in the Currency Overprinting Section. In turn, this realization would have led to a proper determination of a reasonable pay formula for the supervisors working in the Currency Overprinting Section based upon generally accepted federal pay principles, which require higher pay for recognizable differences in work. In support of their contention, plaintiffs point to a similar pay dispute in the late 1950's which involved Currency Overprinting pressmen and eventually led to the Currency Overprinting pressmen positions being designated as premium positions entitled to higher pay due to the more demanding nature of the work. Exhibit 5 of plaintiffs' brief.

At first glance plaintiffs' primary substantive contention appears to have merit. Defendant does not dispute plaintiffs' factual assertion that there is no currently existing printing operation at GPO or in private industry which is comparable to the one in the Currency Overprinting Section. Neither does defendant deny that the COPE equipment presently being used in the Currency Overprinting Section is highly sophisticated equipment. Also, there is no supervisory position in GPO where all the employees supervised are premium employees earning a wage above the wage for the basic craft. Nor is it disputed that the work of the Currency Overprinting pressmen is more difficult and demanding than that of basic journeyman pressmen such as the ones working in the Flatbed Section of BEP. The degree of difference has been officially recognized by the designation of the Currency Overprinting pressmen positions as premium positions in 1958; thus, entitling those holding the positions to higher pay.

However, after a careful review we cannot state that the differences between the supervisory work in the Currency Overprinting Section and the supervisory work at GPO were so markedly different in 1970 as to mandate the conclusion that the asserted alignment of the BEP's supervisory pay formula with that used at GPO was illusory. First, when the disputed pay determination was made on May 11, 1970, the equipment in use in the Currency Overprinting Section was not the sophisticated COPE equipment. The COPE equipment was not introduced until early 1971 and then only on an experimental basis. It was not until 1976 that the COPE equipment was fully adopted and utilized in the Currency Overprinting Section. Second, we cannot state on the facts before us that, merely because the journeyman pressmen positions in the Currency Overprinting Section are more demanding than the work of basic journeyman pressmen such as those working in the Flatbed Section of BEP, it necessarily follows that the supervisory positions in the Currency Overprinting Section also require a greater skill and knowledge than other supervisory positions involving the supervision of basic journeyman pressmen. We find merit in the defend-

ant's assertion that supervisory work requires more than basic knowledge of the work supervised. Supervisory positions involve numerous other abilities such as ability to communicate, integrity, willingness to accept policy, basic fairness, and skill in applying human relations techniques. Thus, it does not follow that, merely because plaintiffs supervised premium employees, the degree of supervisory experience, knowledge, and skill necessary to be a supervisor in the Currency Overprinting Section would be markedly greater than the degree of skill required to oversee other printing operations involving the basic journeyman pressman craft.

Nor do we find merit in plaintiffs' assertion that BEP and the Department of Treasury failed to make an independent investigation of the supervisory situation in the Currency Overprinting Section before they made the disputed May 11, 1970, wage determination and, therefore, that the wage determination is suspect under our holding in *Hearne v. United States, supra.*[4] We find that the administrative record in this case evinces just the opposite—that there was an investigation made into the supervisory pay formula at BEP before the May 11, 1970, wage determination was made. It must have been through some sort of independent investigation that the Director of BEP, James A. Conlon, discovered what he considered a past error in the BEP's Currency Overprinting supervisory pay formu-

la, which led him to recommend to the Department of Treasury the prospective correction in the pay formula. *See* Memorandum from James A. Conlon, Director of the Bureau of engraving and Printing, to A. N. Latham, Jr., Director, Office of Personnel, Department of Treasury (April 16, 1970). However, assuming *arguendo* that there was no independent investigation of the nature of the supervisory work in the Currency Overprinting Section, but merely a rote adoption of the GPO supervisory pay formula on May 11, 1970, we find the lack of such an independent investigation of no help to plaintiffs' case. The reason is that plaintiffs have made no allegation or assertion of fact, such as would have come out in an independent investigation, that would necessarily force the conclusion that the supervisory positions in the Currency Overprinting Section are so manifestly more difficult from other supervisory positions as to legally mandate higher pay. See above.

■ For the same reason (failure to show a manifest difference between the supervisory positions in the Currency Overprinting Section and other supervisory positions), we reject plaintiffs' contention that the disputed May 11, 1970, wage determination violates the essential principles of federal pay administration, as set forth in 5 U.S.C. § 5101 (1970), 5 U.S.C. § 5301(a) (1970), and 5 U.S.C. § 5341 (Supp. V 1975),[5] and therefore is contrary to the public interest and an abuse of discretion.

---

4. This case differs from *Hearne* in that the pay policy disputed in *Hearne* contained a manifest error. *Id.*, 68 F.Supp. at 788, 789, 107 Ct.Cl. at 395, 396. Plaintiffs in the present dispute do not contend that the GPO supervisory pay policy contained a manifest error and thus was inapplicable. Plaintiffs' contention is that the GPO supervisory pay formula should not have been adopted in the Currency Overprinting Section because of the factual differences surrounding the Currency Overprinting Section supervisory positions.

5. The principles set forth in these sections are similar and, therefore, we only set forth the provisions of section 5341 here for illustration.

"§ 5341. *Policy*

"It is the policy of Congress that rates of pay of prevailing rate employees be fixed and adjusted from time to time as nearly as is consist-

ent with the public interest in accordance with prevailing rates and be based on principles that—

"(1) there will be equal pay for substantially equal work for all prevailing rate employees who are working under similar conditions of employment in all agencies within the same local wage area;

"(2) there will be relative differences in pay within a local wage area when there are substantial or recognizable differences in duties, responsibilities, and qualification requirements among positions;

"(3) the level of rates of pay will be maintained in line with prevailing levels for comparable work within a local wage area;

"(4) the level of rates of pay will be maintained so as to attract and retain qualified prevailing rate employees."

Alternatively, plaintiffs argue, although the assertions appear as part of this illusory alignment argument *supra*, that BEP and the Department of Treasury actually misconceived and misconstrued the GPO supervisory pay policy, and thus misapplied the policy in making the disputed May 11, 1970, wage determination. The argument is that the June 12, 1964, GPO Memorandum adopted a supervisory pay policy of paying supervisors 30 percent and 20 percent more than the "basic journeyman *pay of the journeymen supervised.*" Plaintiffs urge that the purpose of this policy was to compensate supervisors according to the degree of difficulty involved in their respective supervisory tasks by basing their pay formula on the base pay of the journeymen actually supervised. That this was the intent behind the GPO supervisory pay formula is further demonstrated, according to plaintiffs, in Government Printing Office Instruction 640.6 (September 9, 1974), which states in paragraph 4(a):

> The basic rule in setting pay for premium positions is that *the wages are based on those of the highest paid craft supervised.* Generally, the uprate employee supervises employees of only one craft, which automatically becomes the allied craft. In some instances, however, the uprate supervises employees of two or more crafts, in which case the "highest paid craft" rule goes into effect. [Emphasis supplied by plaintiff.]

Finally, plaintiffs point to the actual operation of the GPO supervisory pay formula at GPO to support their argument. At GPO the effect of paying supervisors 30 percent and 20 percent more than the wage earned by the basic journeyman craft supervised was that all supervisors also had their wage formula based upon the wage of the journeymen actually supervised; thus, implementing the policy objective of paying supervisors based upon the degree of difficulty of their supervisory position. However, plaintiffs urge that the same effect did not occur when the Currency Overprinting supervisors of BEP had their wage based upon the basic journeyman craft supervised, for the Currency Overprinting pressmen,

although belonging to the basic craft of journeyman pressmen, were paid a premium rate because of the more difficult nature of the Currency Overprinting Section work. It follows from plaintiffs' assertions that this misapplication of the GPO supervisory pay policy in May 1970 actually caused nonalignment—rather than alignment—between the pay policy in effect at GPO and that in effect in the Currency Overprinting Section of BEP.

We cannot agree with plaintiffs that the BEP and the Department of Treasury necessarily misconstrued, misconceived, and misapplied the GPO pay policy in May 1970 when they construed the GPO policy to mean that supervisory personnel were to have their wage based upon the base pay of the basic journeyman craft supervised rather than the pay of the personnel actually supervised. The reason is that GPO did not have any pay policy in effect regarding supervisors who only supervised premium employees, like the plaintiff's herein, because there were no such supervisory positions at GPO. Since there were no identical supervisory situations at GPO, or pay policy for them, we reject plaintiffs' alternative argument that the disputed May 11, 1970, wage determination necessarily caused nonalignment between the GPO supervisory pay policy and the BEP supervisory pay policy rather than the asserted alignment.

Procedurally, plaintiffs contend the disputed May 11, 1970, wage determination is defective for neither BEP or the Department of Treasury granted plaintiffs a hearing either before or after the determination was made, even though plaintiffs requested a hearing. Citing *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969); *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); and *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), plaintiffs stress that constitutional due process requires such a hearing. *Sniadach* and *Fuentes* are inapposite, however, for the rights there were existing property rights. Plaintiffs have cited us no case and we know of no case that has held that a federal

employee has a property interest in a wage formula by which his future wages will be determined. *Goldberg* is equally inapposite. It held that a hearing is required before welfare benefits may be terminated because "termination of aid pending resolution of a controversy over eligibility may deprive an *eligible* recipient of the very means by which to live while he waits." 397 U.S. 254, at 264, 90 S.Ct. 1011, at 1018, 25 L.Ed.2d 287 (emphasis in original). *Cf. Mathews v. Eldrige*, 424 U.S. 319, 332, 339–343, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (evidentiary hearing not required before termination of Social Security disability benefits). Plaintiffs cannot make a similar claim. The adjustment in their future pay formula scale, which never did result in an actual lowering of pay received, did not deny them the means to live while challenging the disputed May 11, 1970, wage determination. Accordingly, we reject plaintiffs' procedural attack on the disputed wage determination also.

Plaintiffs filed voluminous briefs, totaling 245 pages minus the exhibits, in support of their motion for summary judgment. Although not in effect during the briefing in this case, Rule 144(e), as amended on December 9, 1977, of this court now limits the lengths of briefs in cases involving dispositive motions. Despite the voluminousness of the plaintiffs' briefs, we have considered all of the material points raised by the plaintiffs. None of plaintiffs' assertions clearly demonstrates that the BEP, with Department of Treasury approval, is not paying plaintiffs the prevailing rate, as established in a good faith administrative determination, for the supervisory positions they hold. Plaintiffs have not pointed to a single supervisor in private industry or elsewhere who is paid a higher rate for similar work. All plaintiffs have shown is that there are differences between the supervisory positions in the Currency Overprinting Section and the supervisory positions elsewhere in GPO and BEP. It is our judgment that the differences that plaintiffs point out are not sufficiently significant to merit our holding that the BEP and Department of Treasury acted arbitrarily or capriciously when they determined that despite these differences the supervisory pay formula in effect at GPO was appropriate to use in fixing the prevailing rate which plaintiffs should be paid under 5 U.S.C. § 5349 (Supp. V 1975).

For the reasons above stated, we grant defendant's cross motion for summary judgment, deny plaintiffs' motion for summary judgment, and order plaintiffs' petition dismissed.