Daniel BRADLEY, et al., Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Nos. 617–85–C, 394–86–C and 477–86–C.

United States Claims Court.

May 3, 1988.

Lawrence J. Sherman, Washington, D.C., for plaintiffs.

Eric L. Miller, with whom were Asst. Atty. Gen. Richard K. Willard, David M. Cohen and Robert A. Reutershan, Washington, D.C., for defendant. William G. Colbert, Dept. of Treasury, of counsel.

## OPINION AND ORDER

TURNER, Judge.

Plaintiffs in these three consolidated cases are journeymen plate printers (and their local union) currently or formerly employed by the Bureau of Engraving and Printing (BEP), a bureau in the Department of the Treasury.[1] They allege that

---

1. There are 152 individual plaintiffs in these three consolidated actions (six in No. 617–85–C, 145 in 394–86–C and one in 477–86–C). In addition, Washington Plate Printers Union, Local # 2, the local union of the individual plaintiffs, is a named plaintiff in No. 617–85–C. *See* tran-

the appropriate federal official has failed to exercise pay-fixing responsibilities established by 5 U.S.C. § 5349 and regulations of the Department of the Treasury.[2] Plaintiffs seek a judgment directing defendant to institute a new wage rate and awarding back pay retroactive to April 1, 1983, prejudgment and post-judgment interest, attorney fees and costs.

## I

This opinion addresses plaintiffs' motion for partial summary judgment and defendant's cross-motion for summary judgment.

Plaintiffs' motion seeks a judgment declaring that existing law and practice require a certain wage increase for plaintiffs as of a particular date and that the undisputed facts establish that plaintiffs are entitled to money damages, the precise amount of which would be determined in subsequent proceedings.

Defendant moves for summary judgment on the grounds, *inter alia*, that it has under consideration a comprehensive study of wage comparability and related factors affecting production, that a decision on appropriate wage rates for plaintiffs will be forthcoming in due course and that its decision to postpone a final wage determination in order to engage in further study of wage issues was not an arbitrary and capricious abuse of pay-fixing authority.

## II

Pursuant to 5 U.S.C. § 5349, plaintiffs' wages are fixed and adjusted "as nearly as is consistent with the public interest in accordance with prevailing rates ... as the pay-fixing authority of [BEP] may determine." The personnel manual of the Treasury Department states that plate printers at BEP will be paid a wage based upon a job-to-job comparison with comparable jobs at the American Bank Note Company (ABNC), New York, New York. See Treasury Personnel Manual, chapter 532–2–2d (1969) and the Treasury Personnel Management Manual, chapter 532–IV–3b (1984).

In 1970, the Treasury Department established a two-rate wage system for journeymen plate printers which is still in effect. The premium rate, wage scale 2, was aligned with ABNC rates paid for operation of presses described as two-plate TA presses. Plate printers at BEP receiving this wage operate high speed and multi-color presses. The basic rate for new hires, wage scale 1, was originally aligned with ABNC rates paid for operation of presses designated S, Proving, and Hand presses, although these presses are now obsolete at BEP. Wage scale 1 is fixed at a rate equal to 90% of wage scale 2. In 1983, BEP and Treasury, still applying the two-rate wage system, determined the exact wage for the BEP plate printers by referring to the pay schedule in a collective bargaining agreement between ABNC and the New York Plate Printers Union. That agreement established a wage for the S, Proving and Hand presses, a wage for two-plate TA presses, a wage for still another press (a WRIP press), and other wages.

## III

In 1984, representatives of plaintiffs' local union became convinced that its members were being paid a wage far less than

script of status conference held February 25, 1986, pp. 14–15. The appropriateness of the local union's status as a party has not been adjudicated.

**2.** Although resolution of the issue is unnecessary to the disposition of the parties' cross-motions for summary judgment, there seems to be some uncertainty over precisely which official or group of officials constitutes the "pay-fixing authority" for BEP wages. Title 5 U.S.C. § 5349(a) provides that the pay of BEP plate printers shall be "fixed and adjusted from time to time ... as the pay-fixing authority of [the BEP] may determine." "Pay-fixing authority" is not defined in Title 5. Neither the Director of BEP nor any superior official in the Treasury Department is specifically designated as the "pay-fixing authority" for BEP. The incumbent Director, as of July 1986, viewed his duties respecting BEP wages to be to "implement the wage formulas and policies established or approved by [a Treasury official outside the BEP] or to recommend changes in wage formulas or policies." The Director further maintained that neither he nor any subordinate bureau official had the authority "to unilaterally change wage formulas or structures" for BEP employees. Leuver Declaration, July 29, 1986, ¶ 2, p. 2.

that received by comparable employees at ABNC. Further, the local union believed that the plate printers at BEP were using more sophisticated equipment than that being used by their ABNC counterparts. In June 1984, plaintiffs' local union requested that BEP do a study comparing wages of BEP and ABNC plate printers. Specifically, the union stated that the study should "identify the plants and piece(s) of equipment on which working conditions are most similar to those at the Bureau." The study should also "determine whether plate printers assigned to such equipment perform comparable job functions." Lastly, the study should "determine whether plate printers employed at the Bureau are required to possess and use on the job greater skills, knowledge, and abilities" than printers at ABNC. The Bureau agreed to conduct the study, and it was completed in April 1985.

The BEP study team toured ABNC facilities and prepared a draft report discussing findings and recommendations. The study team determined that significant differences existed between the equipment at ABNC and BEP and that the BEP equipment was "more sophisticated, complex and significantly more productive than the equipment now in operation at ABNC." The draft report noted that ABNC officials considered the WRIP press to be their most sophisticated and technologically advanced press. The draft report concluded that since "the initial basis no longer exists on which the current pay structure was established, revisions to the structure are considered necessary in order to assure [that] a more equitable pay structure is established for BEP Plate Printers."

The draft report proposed that the wage paid at ABNC for operation of the TA press should become the basic wage at BEP for newly hired printers (wage rate 1), and that the wage rate paid at ABNC for operation of the WRIP press should become the premium rate at BEP for qualified journeymen plate printers (wage rate 2). BEP and Department of Treasury officials did not adjust the wage rates of the plate printers in spite of the draft report. Specifically, on November 20, 1985, Robert

J. Leuver, the Director at BEP, advised against a wage increase for BEP plate printers. He felt that a wage increase was undesirable primarily on the grounds of public interest. Instead, he proposed that a second, more in-depth wage study be undertaken, and he estimated that this study would be completed by August 30, 1986. Leuver felt that the second study was needed so that inquiry could be made into the total compensation packages at ABNC and BEP. He also felt that the relative productivity levels of the two facilities needed to be compared. It was also Leuver's view that the first study failed to consider the level of equipment manning at the facilities, the type of operator at each piece of equipment, and the effect of new equipment on work requirements. On March 27, 1986, John Rogers, Assistant Secretary of the Treasury (Management), agreed with Leuver's proposal for the second study. The second study was undertaken, and, according to defendant, a final report will be ready by mid–1988.

### IV

■ A threshold, pivotal matter respecting defendant's dispositive motion is plaintiffs' objection to the supporting affidavit of Robert J. Leuver, dated July 29, 1986. Plaintiffs have launched a lengthy and energetic assault on this document in an attempt to render it inadmissible. According to plaintiffs, the affidavit is filled with inaccuracies, misstatements and hearsay. After careful study of both the affidavit and plaintiffs' objections, it is determined that the Leuver affidavit must survive plaintiffs' attack.

In the affidavit, Leuver states his credentials and explains his experience with wage related matters at BEP. In 1979, Leuver was Assistant Director for Administration, and he held this position until his appointment as Deputy Director of the Bureau in December of 1982. From January 1983 until at least July 1986 (the date of the affidavit), Leuver was Acting Director and then Director of BEP. In this position, he was responsible for all business and operations of the Bureau subject to the direction

of the Secretary of the Treasury. Leuver had authority to implement or recommend changes in wage formulas and policies established or approved by higher officials in the Department of the Treasury. Plaintiffs do not dispute any of this background information.

Given this experience, Leuver is certainly qualified to discuss wage policies and past and current wage practices at BEP. *See Aydin Corp. v. United States*, 669 F.2d 681, 684–85, 229 Ct.Cl. 309, 313–14 (1982) (an affiant is competent to discuss matters about which he has knowledge by virtue of the responsibility of his position). He is also in a position to discuss the completeness of the initial BEP wage comparability study, for Leuver's recommendation on this matter was solicited by John Rogers, Assistant Secretary of the Treasury (Management). The thoroughness of the initial study is a central issue in this litigation, and no one is more qualified than Leuver to explain the reasons and rationale underlying his own recommendations.

The statements in Leuver's affidavit are supported by documentary evidence and concern matters about which he has personal knowledge. Plaintiffs' attempt to strike the affidavit must fail, and plaintiffs' allegation that the affidavit was presented in bad faith is without merit. *See McEachern v. Office of Personnel Management*, 776 F.2d 1539, 1544 (Fed.Cir.1985) ("[i]t is well settled that in order to show bad faith on the part of a Government official, the [plaintiff] must submit 'well-nigh irrefragable proof' to sustain the charge, as it is presumed that Government officials act in an appropriate and lawful manner in the discharge of their duties").

## V

The core issue of each party's dispositive motion concerns the bounds of lawful discretion of the pay-fixing authority. Plaintiffs assert that defendant's refusal to adjust wages in spite of evidence suggesting that the rates are misaligned is an arbitrary and capricious abuse of pay-fixing authority. Defendant counters by stating that it is well within the discretion of the Department of the Treasury to undertake a second, more detailed wage comparability study before making a final wage determination. The question before the court is whether defendant's decision was an abuse of discretion.

■ Judicial review of a wage decision made by government officials pursuant to 5 U.S.C. § 5349 is limited. The court may overturn such a decision only if there had been an abuse of discretion, or if it is " 'so arbitrary as to be clearly wrong.' " *Adams v. United States*, 810 F.2d 1142, 1144 (Fed.Cir.1987); *see also National Maritime Union v. United States*, 682 F.2d 944, 955, 231 Ct.Cl. 59, 75 (1982) (wage decision pursuant to 5 U.S.C. § 5348(a) (similar in concept and purpose to § 5349) is subject to narrow review and will not be overturned except for abuse of discretion).

■ Here, the defendant declined to realign wage rates because of a determination that a more comprehensive wage comparability study was needed. Defendant asserts that the first study failed to consider a number of relevant factors. First, the initial study did not consider the total compensation packages at ABNC and BEP. Total compensation offered necessarily impacts on wages paid and thus affects comparability. Second, the initial study failed to consider the level of equipment manning at BEP and ABNC. The level of equipment staffing affects the number of skills exercised by the plate printer and therefore should be a factor in wage determinations. Third, the initial study failed to investigate the effect that changed equipment has had on craft and work requirements at the two facilities. Conceivably, the changed equipment, though more productive, may lessen a printer's work load and therefore needs to be considered when studying wage and job comparability.

An examination of the BEP study team draft report supports defendant's contentions. The study team specifically evaluated the relative sophistication and complexity of the equipment at BEP and ABNC, as well as the duties of plate printers operating the equipment. There is no indication, however, that the study team examined the

questions which prompted the defendant to undertake the second study. Plaintiffs argue against this conclusion, stating that the second study is unnecessary and superfluous, but these arguments are not persuasive.

Accordingly, defendant was not clearly wrong and did not abuse its discretion by deciding to undertake a second wage comparability study before making a final wage determination. The defendant is presently analyzing the results of the second study and plans to issue a final report in mid–1988. Defendant will then make its final wage decision and state whether, in its judgment, plaintiffs' wages have or have not been misaligned.[3]

## VI

Plaintiffs also argue that defendant has committed manifest error by allegedly fixing plaintiffs' wages by comparison with inexact and obsolete job matches at ABNC. *See Hearne v. United States,* 68 F.Supp. 786, 107 Ct.Cl. 335, 393–99 (1946), *cert. denied,* 331 U.S. 858, 67 S.Ct. 1752, 91 L.Ed. 1865 (1947); *Baratt v. United States,* 585 F.2d 1041, 1044–47, 218 Ct.Cl. 242, 246–52 (1978). As previously stated, defendant's decision regarding the need to undertake a second study into the appropriateness of the current wage system at BEP was not an abuse of discretion. Thus, whether plaintiffs' wages are based upon a comparable job match with employees at ABNC is still an unanswered question. Accordingly, on the current facts, the pay policy of defendant is not completely erroneous and does not constitute manifest error. *See Baratt,* 585 F.2d at 1046–47.

## VII

■ Finally, plaintiffs assert that defendant has totally refused to discharge its responsibilities and has engaged in excessive delay. Plaintiffs argue that 5 U.S.C. §§ 555(b) and 706(1) provide a remedy under these circumstances. Assuming appli- cability of these sections in this litigation, defendant has neither withheld nor excessively delayed a final decision. Plaintiffs first requested a wage comparability study in June 1984, and this study was completed in April 1985. In November 1985, the Director of BEP decided that a more comprehensive study was needed, and in March 1986, the Assistant Secretary of the Treasury (Management) agreed. The second study was undertaken, and, according to defendant, the results of the study will be finalized by mid–1988.

These facts demonstrate that defendant has not refused to act as plaintiffs claim. Instead, defendant has been engaged in an ongoing decision-making process for nearly four years. Plaintiffs also argue that four years constitutes excessive delay. Although four years is a long time and plaintiffs certainly deserve to have this important issue resolved, it would be premature at this time to call this delay unreasonable. *See generally Public Citizen Health Research Group v. Brock,* 823 F.2d 626, 627–29 (D.C.Cir.1987) (delay of over six years by OSHA in promulgating a rule regarding exposure limits to toxin ethylene oxide would be unreasonable given health risks); *Sierra Club v. Thomas,* 828 F.2d 783, 797–99 (D.C.Cir.1987) (delay of less than three years by EPA in promulgating a final rule regarding the classification of emissions from strip mines is not unreasonable); *United Steelworkers v. Pendergrass,* 819 F.2d 1263, 1264, 1269–70 (3d Cir.1987) (delay by Secretary of Labor of almost two years after a court order to take action and a total of 16 years after passage of a law requiring that covered employees be made aware of on-the-job hazards is unreasonable); *Blankenship v. Secretary of HEW,* 587 F.2d 329, 331, 333–36 (6th Cir.1978) (delay of longer than 30 days in the review of denial of benefits is unreasonable where many applicants are destitute and seek the necessities of life); *Nader v. FCC,* 520 F.2d

---

**3.** The pay-fixing authority does not have discretion to delay a wage adjustment decision indefinitely. Failure by defendant to issue its final report and to make a wage decision would certainly suggest that the defendant has engaged in arbitrary and capricious delay tactics. However, it would be premature at this juncture to suggest how long is too long to complete a study and render a decision in the context of these cases.

182, 187, 205–07 (D.C.Cir.1975) (delay of ten years by FCC in completing an inquiry into the level of telephone company's earnings and costs is unreasonable).

## VIII

In these cases, plaintiffs ask the court to order the defendant to realign plaintiffs' wage rates, to order the defendant to add an appropriate premium to this realigned wage and to grant plaintiffs back pay to 1983. If this action were taken, the court would obviously be substituting its judgment for that of the officials possessing pay-fixing authority under 5 U.S.C. § 5349. As previously stated, the defendant's decision to undertake a second wage study and to postpone a final wage determination was not an abuse of discretion, and defendant's wage policies do not constitute manifest error. Under these circumstances, it is clear that plaintiffs' current request for relief must be denied.[4]

## IX

Based on the foregoing, plaintiffs' motion for partial summary judgment is denied and defendant's cross-motion for summary judgment is granted. Accordingly, judgment for defendant shall be entered in each of these consolidated cases. Each party shall bear its own costs.

---

4. Plaintiffs seek, *inter alia*, back pay retroactive to April 1983. Defendant counters that pay caps would prohibit a wage increase even if plaintiffs' wage rates were misaligned. In fiscal years 1983–1986, pay ceilings were instituted for most federal civilian workers. Throughout this period, the Office of Personnel Management (OPM) advised officers of the executive branch with administrative wage fixing authority to exercise their authority with the policy of pay ceilings in mind. For each year, the Department of the Treasury adopted the recommended policy of OPM. Accordingly, BEP instituted a 4.0% ceiling on wage increases in 1983, a 4.0% ceiling in 1984, a 3.5% ceiling in 1985 and a wage freeze in fiscal year 1986. Wage increases for plate printers during this period were 4.0% in 1983, none in 1984 (a year for which the ABNC agreement provided no raise), 3.5% in 1985, and none in 1986. Based on these factors, defendant contends that even if the new study had been completed and wage increases had been found appropriate, plaintiffs would not have received any payable wage increase, at least through FY 1986. In light of the decision that defendant has not abused its discretion by engaging in further study of the comparability issue, it is unnecessary to address the pay cap question at this time.