Harvey HENDERSON, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

Nos. 477–85 C, 407–86 C.

United States Claims Court.

June 7, 1989.

John C. Morrison, for plaintiffs.

Stephen J. McHale, with whom were Asst. Atty. Gen. John R. Bolton, Asst. Director Robert A. Reutershan, and Director David M. Cohn for defendant; William C. Colbert, Dept. of Treasury, of counsel.

## OPINION

WIESE, Judge.

Title 5 of the United States Code, section 5349(a), *as amended*, pertains in general to the pay of employees in the Federal Government who are engaged in positions having trade, craft or laboring experience and knowledge as a principal requirement. The statute provides that the pay of such employees "shall be fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates...." The purpose of the statute is "to keep reasonable parity between public and private employees." *National Maritime Union of America v.*

*United States,* 231 Ct.Cl. 59, 74, 682 F.2d 944, 954 (1982).

The questions we encounter in this consolidated action are whether the administrative agency involved here, the United States Department of the Treasury ("Treasury Department"), abused the pay-fixing authority granted by the statute when it (i) declined to allow eligible employees (plaintiffs herein) a "catch-up" pay increase and (ii) revoked a previously granted pay adjustment. The issues are before the court on cross-motions for summary judgment. Having considered the parties' briefs and oral arguments, we conclude that plaintiffs are entitled to judgment on the first issue and the Government is entitled to judgment on the second issue.

## FACTS

Plaintiffs are employees of the Bureau of Printing and Engraving (the "Bureau"), a component of the Treasury Department. They are engaged in a specialized craft, siderography,[1] the basic pay rates of which are subject to the requirements of 5 U.S.C.A. § 5349(a) (West Supp.1989), that is, the rates are administratively determined by reference to prevailing wages for comparable positions in the private sector.

The Treasury Department, which is the administrative authority responsible for establishing the policies and formulas governing the siderographers' wage rates, has specified in its regulations that the siderographers "will be paid rates based on job-to-job comparison with comparable jobs in the American Bank Note Company, New York, N.Y." Treasury Personnel Management Manual ("TPMM") ch. 532, IV–2, ¶ 3b (1984). Responsibility for implementation of the pay formula and policies thus established by the Treasury Department has been delegated to the Director of the Bureau of Printing and Engraving (the "Director"). TPMM ch. 532, V–2, ¶ 3.

Reliance on the American Bank Note Company's positions as the point of reference for determining the pay of the Bu-

reau's siderographers (referred to as a "tandem pay relationship") has been the authorized practice of the Treasury Department for at least the last twenty years. For much of that time wage rates between the two groups remained in parity notwithstanding the introduction of annual pay caps on most federal civilian salaries beginning in fiscal year 1979. That is to say, the Bureau's siderographers were either granted end-of-year "catch-up" wage increases (this was the case in 1979 and 1980) or they were deemed exempt from the pay caps applicable to other federal workers (this was the case in 1981 and 1982). Thus, until 1983, the annual percentage increases in the wages of the siderographers of the American Bank Note Company led to matching increases for the siderographers of the Bureau of Printing and Engraving.

A change set in in 1983. In that year, the siderographers at the American Bank Note Company received a seven percent basic wage rate increase together with a separate one dollar per hour wage adjustment, the latter designated (by the terms of the collective bargaining under which it originated) as a "special" adjustment for increased production and quality. The siderographers at the Bureau were not granted a matching increase. Rather, in a wage adjustment announced on August 12, 1983 (and made retroactive to May 16, 1983) the Director limited the siderographers to a four percent rate increase—an adjustment which the wage bulletin explained "reflects the same ceiling imposed by the Treasury Department [on other members of that agency's workforce]". Thus, the pay cap imposed on the plaintiffs was in keeping with a four percent ceiling on pay increases for most Federal civilian workers including those under the General Schedule and related pay systems and most Federal wage employees.

Notwithstanding the policy of aligning plaintiffs' wage increases with those of other Government employees, in October of 1983 the Director decided that the addition-

---

**1.** Siderography refers to the process by which engraved steel plates are duplicated from an original engraving.

al one dollar per hour pay increase which the American Bank Note Company employees had received should also be granted to plaintiffs. This change, also made retroactive to May 16, 1983, was identified in the Director's wage bulletin as a "correction" to the siderographers' basic pay rates. This pay "correction" remained in place for several years. However, in 1985 the validity of the Director's action was called into question and then, in 1986, following further evaluation of the matter, the Treasury Department decided to revoke the one dollar pay increase. The bases for this action were, first, the Treasury Department's conclusion that the one dollar increase violated the four percent pay cap in effect in 1983 (the year in which it first was granted) and, second, that it ran afoul of the administrative rule endorsed in *Amell v. United States*, 182 Ct.Cl. 604, 390 F.2d 880, *cert. denied*, 393 U.S. 852, 89 S.Ct. 88, 21 L.Ed. 2d 122 (1968), that private sector fringe benefits are not wages for purposes of comparability pay adjustments under "prevailing wage" statutes. The correctness of the Treasury Department's decision to revoke the 1983 wage correction is one of the two issues we encounter in this case. The Government, we should add, has filed a counterclaim to recapture the monies involved.

The other matter in question also has its roots in 1983. As previously noted, siderographers at the American Bank Note Company had received a seven percent pay increase in 1983 while their counterparts at the Bureau of Printing and Engraving were held to the government-wide pay adjustment of four percent. In the following year, 1984, the siderographers at the American Bank Note Company did not receive a pay increase; neither did the plaintiffs. However, other prevailing wage employees at the Bureau did receive pay adjustments as authorized under the tandem pay relationship applicable to their particular crafts (but again capped, as in 1983, by a government-wide maximum of four percent). Consequently, the Director requested permission from the Treasury Department to grant plaintiffs a wage increase—notwithstanding the absence of any corresponding

adjustment in the private sector—because the 1983 pay cap had prevented their participating to the full extent of that year's prevailing wage increase.

The matter was presented to the Treasury Department in the form of a proposed "catch-up" wage adjustment, *i.e.*, a request for an increase of three percent in 1984 (less than that year's pay cap) to recapture the like amount relinquished in 1983 and thereby to restore plaintiffs to a position of parity with their industry counterparts. The request was rejected on the ground that "an increase granted on this basis would reflect unsound wage administration by establishing a precedent to circumvent the intent of the Administration's pay cap guidance." It is this rejection which identifies the second of the two issues plaintiffs present here. As to both issues, plaintiffs maintain that the Government has abused its pay-fixing authority by invoking the public interest criterion to justify salary actions that violated the fundamental purpose of the statute.

## DISCUSSION

It is settled law that administrative agencies charged with the implementation of "prevailing wage" legislation enjoy broad discretion in the exercise of authority thus granted them. *Baratt v. United States*, 218 Ct.Cl. 242, 248, 585 F.2d 1041, 1045 (1978). Agency action undertaken pursuant to such legislation is not to be set aside unless such action demonstrates an abuse of discretion or else is so arbitrary as to be clearly wrong. *Adams v. United States*, 810 F.2d 1142, 1144 (Fed.Cir.1987). Equally well established is that the "public interest" clause of such legislation has independent significance, meaning that it authorizes consideration of factors that may, at times, offer competing considerations to the basic legislative aim of assuring equality of pay. In *National Maritime Union of America v. United States*, 231 Ct.Cl. 59, 682 F.2d 944 (1982), a case involving a back pay demand based on the prevailing wage requirements of 5 U.S.C. § 5348 (a likeworded statute applicable to federal em-

ployees engaged in the maritime trade [2]), the point was explained this way:

> First, the primary purpose of the statute is to ensure that the pay of these employees will be comparable to those in the private sector.... Second, the public interest is a consideration placed in opposition to equality of pay. The language "as nearly as is consistent with" anticipates that equality of pay may *not* always be entirely consistent with the public interest. These countervailing considerations create a kind of tension in the statute which is crucial to the system, as it provides the administrative discretion needed to operate efficiently a wage system.... 231 Ct.Cl. at 65, 682 F.2d at 949 (emphasis original; footnote omitted).

What was said of section 5348 in *National Maritime* applies as well to section 5349 —in both instances the "public interest" clause may dictate a wage determination contrary to the statute's essential command of pay parity. Indeed, it was on the basis of the decision in *National Maritime* that the court in *Adams v. United States,* 810 F.2d 1142 (Fed.Cir.1987) upheld a determination of the Bureau of Printing and Engraving to limit prevailing wage increases in accordance with Executive Department pay cap recommendations. The pay cap was an Administration effort undertaken to fight inflation; hence, a decision by the Bureau to join in that effort by imposing pay caps on prevailing rate employees was seen as a legitimate exercise of administrative authority. 810 F.2d at 1144.

■ With these rulings in mind, we turn to the issues in the case starting with the question whether plaintiffs were improperly denied a "catch-up" pay adjustment in 1984. The Government defends the Treasury Department's action by relying on essentially the same position which that agency had earlier expressed: that it would undermine the public interest considerations inherent in a pay cap to permit plaintiffs to retrieve those wages in 1984 which concerns for fiscal economy had withheld from them in 1983. The Government also contends that nothing in the text of section 5349 or in the regulations implementing that statute "requires that raises denied because of pay caps imposed in the public interest be granted at some future time to achieve comparability." Thus, from the Government's point of view, the Treasury Department's rejection of plaintiffs' demand for a catch-up increase was an action both justifiable in fact and consonant with law.

The court cannot accept this argument. To start with, we cannot endorse the view that the allowance of a catch-up increase in 1984 would amount to a circumvention of the pay cap in place in 1983. That argument could have force only if public interest considerations—as expressed in congressional or administrative wage guidelines—had urged a curtailment of all salary increases for federal workers in 1984. But that was not the case. In 1984, as in 1983, federal salaries were permitted to rise, subject to a four percent pay cap. Given, therefore, that back-to-back increases in annual salaries were available to federal employees, it cannot be successfully argued that granting the Bureau's siderographers an increase in 1984 would amount to an "end-run" on the 1983 pay cap. Public interest considerations did not counsel against a wage increase in 1984; the Treasury Department's view to the contrary has no support in the facts.

But this conclusion does not end the matter. As noted, the Government maintains that even if public interest considerations did not counsel against a wage increase in 1984, nevertheless, nothing in the language of section 5349 required the agency to adjust 1984 salaries in order to overcome a 1983 wage cap. Indeed, the Government maintains that under the relevant regulations, adjustments to plaintiffs' salaries are required only "whenever rates for each matched job are adjusted in the American

---

**2.** Sections 5348 and 5349 of Title 5 use the same directive language: "the pay of [specified employees] shall be fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates...."

Bank Note Company." TPMM ch. 532, IV–2 ¶ 3b. Siderographers at the American Bank Note Company did not receive a wage increase in 1984; therefore, argues the Government, neither were plaintiffs entitled to an increase. In short, it is the Government's position that even if the public interest criterion did not disfavor an increase in plaintiffs' salaries in 1984, still no raise was authorized absent the triggering event of a private sector increase.

The argument is not persuasive. As we have noted, the purpose of section 5349 is to maintain reasonable salary parity between public and private workers engaged in like work to the extent such parity is consistent with the public interest. This being the purpose of the statute, regulations issued under its authority are valid only to the extent they are consistent with that end. The regulation in question fails to meet this requirement—at least as applied to the facts of this case. In tying the initiation of a salary adjustment to the triggering event of a private sector increase, plaintiffs are denied a salary increase even though their current wages are below the prevailing standard and no legitimate public interest concern would preclude the granting of an increase. Thus, rather than further the statutory purpose, the regulation frustrates that purpose.

No doubt the regulation represented an administratively sound approach to the implementation of the statutory standard—the norm of a prevailing wage—during those years in which wage adjustments were not affected by a pay cap on federal salary increases. But regulations are not written to last forever. The proper administration of a statute by those charged with its enforcement demands that regulations be periodically reviewed and, where necessary, changed, in order to accommodate changes in the economic environment in which those regulations are expected to operate. See *American Trucking Associa-*

*tions v. Atchison, Topeka, & Santa Fe Ry.*, 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847 (1967). This was not done here. The language of the regulation has remained unaltered since its promulgation notwithstanding the intrusion of federal pay caps upon the pay adjustment mechanics of the regulation. What results, therefore, is a situation in which public interest considerations (as expressed in federal pay caps) influence prevailing wage determinations only in the year private sector salaries are adjusted and not in "off" years. Of necessity then, the pay caps can serve only to constrain increases sanctioned by the prevailing wage but never to authorize such increases. The consequence is an ever-widening gulf between private and public sector salaries.

This lopsided administration of the statute cannot be what Congress had in mind. The statute directs the administrator to adjust employee salaries "from time to time as nearly and is consistent with the public interest in accordance with prevailing rates." To honor this command, the agency must look not only to the latest industry wage (the prevailing wage) but also to the latest expression of the public interest (the current year's pay cap).[3] Each is a component of the statutory equation and therefore each must be examined "from time to time" to assure that salary decisions are in accord with prevailing standards.

It is no answer to this obligation to say that the statute does not specifically require catch-up increases to achieve comparability. The command of the statute is ongoing and therefore changes in the public interest factor are as much a warrant for reexamination and adjustment of employee salaries as are changes in the prevailing wage. Accordingly, to the extent the Treasury Department deems itself bound to take cognizance of public interest considerations only when wage changes oc-

**3.** We do not mean to suggest that cognizance of federal pay caps is all that the public interest factor requires (or permits). Certainly a sound wage policy pays attention to management/worker concerns that go beyond the question of whether there are economic restraints upon an agency's adoption of a going industry wage rate. In this case, however, the agency identified no reasons for its decision against a wage increase other than the 1983 pay cap.

cur in the private sector (and that, ultimately, is the logic both of the agency's regulation and its position here), it is misinterpreting the statute. The economic considerations expressed in the 1984 pay cap should not have been by-passed; their recognition would have favored a wage increase to the extent of fulfilling the statutory directive for salaries commensurate with the prevailing wage. The agency's misapplication of the law renders its decision arbitrary and an abuse of discretion. Since we deal here with a pay mandating statute, *Bradley v. United States*, 870 F.2d 1578, 1580 (Fed.Cir.1989), plaintiffs are therefore entitled to a judgment for the amount erroneously denied them.

■ Regarding the other issue in the case—the Treasury Department's decision to revoke the supplementary one dollar pay adjustment granted plaintiffs in 1983—there is no basis upon which to question this action. As has been pointed out, decisional law affirms an agency's authority to adhere to Government-wide pay caps when initiating salary adjustments under 5 U.S.C. § 5349. *Adams v. United States*, *supra*. Where conformance with such a policy has been announced by the pay-fixing authority, then salary adjustments given in excess of the pay restriction are, by definition, unlawful. That is what happened here. The Bureau had granted an increase which violated the Treasury Department's previously announced decision to adhere to the four percent pay cap applicable in 1983; the increase, being unlawful, was thus properly revoked.

Plaintiffs attempt to avoid this result by contending that the one dollar per hour adjustment was not a raise but, rather, was added compensation given in recognition of additional duties to be performed. The argument does not help. Assuming plaintiffs are right in saying they took on additional "duties" (a point the Government very much disputes)[4] the argument fails to explain how the Bureau's delegated authority to align employee wage rates with industry standards can simultaneously authorize a decision to align employee work assignments with industry standards. Fixing wage rates and defining job requirements are entirely separate matters. *See* TPMM ch. 532, V–2, ¶ 3; VI–1, ¶¶ 1–4 dealing, respectively, with prevailing rate determinations and job grading systems. Hence, we see no support for the position that, pursuant to its pay-fixing authority, the Bureau could rewrite employee job requirements to justify a subsequent wage increase. The reclassification of the siderographers' job assignments having proceeded without adherence to required procedures, the action is a nullity. And so too is the wage increase that was based on that reclassification. It follows, therefore, that plaintiffs have no legal right to the one dollar per hour wage increase. For that same reason, the Government is entitled to judgment on its counterclaim.

## CONCLUSION

Based on the reasons stated, plaintiffs' motion for summary judgment is granted with respect to their claim to a catch-up wage increase for 1983 and subsequent years; the remainder of the motion is denied. Similarly, defendant's motion for summary judgment is granted with respect to the Government's right to revoke the one dollar per hour wage increase that was granted plaintiffs effective May 1983; the remainder of the motion is denied. Con-

---

**4.** The additional tasks which plaintiffs assumed were described in the American Bank Note Company's collective bargaining agreement as "production and quality" increases to be accomplished as part of the employees' "regular duties." The agreement described these tasks as follows:

1. Die and Roll examination to determine which stock die and/or roll is most appropriate for use for the job to be worked. Assist in pulling work out of, and returning of work to, the vault when conditions warrant.

2. From established jobs list, initiate own work by priority if Supervisor instructs or is not available.
3. Roll up back of work when departmental workload permits and approved by Supervisor.
4. During transferring procedure, work the face of the die to minimize distortion and provide a flatter die.
5. Assist in annual intentory as directed.

sistent with this ruling, the Government is entitled to recover on its counterclaim.

The sums due plaintiffs in accordance with this opinion (less amounts owed the Government on its counterclaim) shall be determined by the parties and adopted by them as the basis for a stipulation for entry of judgment to be filed with the court within 30 days of the date of this opinion. No costs.